**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————————
                :
ROBERT DICUIO, on behalf of himself   :
and all others similarly situated,      :
                :
        Plaintiff,      :    Civ. Action No.: 11-1447 (FLW)(TJB)
                :
v.                :        **OPINION**
                :
BROTHER INTERNATIONAL       :
CORPORATION,            :
                :
        Defendant.     :
————————————————————:

**WOLFSON, District Judge**:

In this putative class action, Plaintiffs Robert Dicuio ("Dicuio"), William Self, Karen Pociluyko, and Angela Bryant (collectively "Plaintiffs") bring suit under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332, alleging that Defendant Brother International Corporation ("Defendant" or "Brother") designed its printers and color ink cartridges in such a way that all color cartridges will signal "toner life end" simultaneously, even though only one cartridge may be exhausted. The Second Amended Complaint ("SAC") asserts claims under the New Jersey Consumer Fraud Act; the Indiana Deceptive Consumer Sales Act; the Illinois Consumer Fraud and Deceptive Business Practices Act; and the Florida Deceptive and Unfair Trade Practices Act.[1]  Defendant has filed motions for summary judgment against all named

———————————————

[1] The SAC also makes claims under the the California Unlawful, Unfair and Fraudulent Business Practices Act and the California Consumer Legal Remedies Act; however, the only named plaintiff with standing to assert California claims, Reuben Zadeh, voluntarily dismissed his claims. *See* Order, October 17, 2013. Therefore, such claims are no longer asserted.

Plaintiffs; Plaintiffs oppose these motions and have moved for class certification. In addition to opposing the motion for class certification, Defendant moves to strike certain evidence that Plaintiffs submitted in support of that motion.

For the reasons expressed below, Defendant's motions for summary judgment against Plaintiffs Robert Dicuio, William Self, Karen Pociluyko, and Angela Bryant are granted. Having granted those motions, the class certification motion is moot. In addition, because Defendant has moved to strike only evidence submitted in favor of class certification, I need not decide these motions; I have, however, considered all evidence submitted.

**PROCEDURUAL HISTORY**

The original Complaint in this case was filed as a putative class action by Plaintiff DiCuio, a New Jersey resident, in New Jersey Superior Court, on January 31, 2011. *See DiCuio v. Brother Internat'l Corp.*, 2011 WL 5557528 at *1 (D.N.J. Nov. 15, 2011). The case was removed to this Court on March 14, 2011. *Id.*; Notice of Removal. Following this Court's denial of Plaintiff's motion to remand, *see id.*, the First Amended Complaint (FAC) was filed on December 21, 2011. The FAC named as additional Plaintiffs the following: Self, Karen Pociluyko, and Bryant, as well as Robert Albanese, Terry Pociluyko, Reuben Zadeh, and Robert Steur[2]. In addition to state law claims of breach of contract and breach of express and implied warranties, the FAC asserted causes of action under the consumer fraud statutes of each

---

[2] Albanese, Terry Pociluyko, and Steur all withdrew their claims prior to the filing of the Second Amended Complaint; as stated above, Zadeh withdrew his claims before the present motions were filed. The only remaining Plaintiffs are Robert DiCuio, Angela Bryant, Karen Pociluyko, and William Self.

Plaintiff's home state namely: New Jersey, California, Pennsylvania, Indiana, Illinois, and Florida.

The FAC alleged the following facts: Plaintiffs purchased certain Brother model printers and color toner cartridges for use in those printers. FAC at ¶ 1. Specifically, the claims cover Brother-brand printer model numbers: HL-4070CDW/4040CN/4040CDN/4050CDN, DCP 9040CN/9042CDN/9045CDN, and MFC-9440CN/9450CDN/9840CDW. *Id.* The claims also cover color toner cartridge models TN-110 and TN-115. *Id.* Plaintiffs alleged that "Defendant sold printers designed to be rendered inoperable when only one of three independent color cartridges is exhausted." *Id.* at ¶ 2. Each Plaintiff stated that he or she had incurred additional costs by being "forced to purchase not only a replacement . . . color toner cartridge for the color that had been exhausted, but two other new toner color cartridges for the other two colors." *Id.* at ¶¶ 3–9.

Plaintiffs further alleged that the user manuals sold with the printers indicate that "the approximate life of each of the three color cartridges is '1500 pages at 5% print coverage." *Id.* at ¶ 22. In addition, the manuals state that "when the ink has been exhausted in any one particular cartridge, a message will be displayed indicating 'toner life end' indicating which particular color cartridge must be replaced in order that the printer continue to operate." *Id.* According to the FAC, "both the printer itself and the messages it provides on its panel and the user manual leave the consumer to believe that when the ink of any one color has been used up, replacement of that color alone will be sufficient to restore the printer to its full capabilities. In fact, this is untrue." *Id.* at ¶ 24.

Defendant moved to dismiss the FAC; an opinion was issued in August 2012 denying the Motion to Dismiss ("August 2012 Decision"). Because my reasoning in that decision continues

to be relevant in this opinion, I will reiterate some portions of that decision here. In the August 2012 decision, I rejected Defendant's argument that the Complaint did not state a claim under the NJCFA. *DiCuio v. Brother Internat'l Corp.*, 2012 WL 3278917 (D.N.J. Aug. 29, 2012). First, addressing Defendant's argument that the FAC did not allege unlawful conduct, I noted that my prior decision in *Arcand v. Brother Internat'l Corp.*, 673 F. Supp. 2d 282 (D.N.J. 2009)[3], did not govern this case. *Id.* at *5. I stated that "unlike the plaintiffs in *Arcand*, Plaintiffs have not hinged their suit on the number of pages they expected to receive per cartridge." *Id.* at *6. Rather, "[the] NJCFA claim is rooted in the User Guide's representation that when the 'toner life end' signal with the accompanying designation of a letter corresponding to one cartridge color is displayed, only that specific cartridge need be replaced—not also the other two undesignated color cartridges." *Id.* I then found that the Plaintiffs' allegations that "Defendant designed its printers with a function that would compel its customers to prematurely and unnecessarily buy two additional color toner cartridges each time one color cartridge was exhausted" was sufficient to allege unlawful conduct under the NJCFA. *Id.*

I next turned to ascertainable loss under the NJCFA. I found that the Plaintiffs were proceeding under an out-of-pocket theory, rather than a benefit of the bargain theory. *Id.* at *7–*8. I concluded that "Plaintiffs have sufficiently pled out-of-pocket losses under the NJCFA by asserting that they expended funds to purchase additional color toner cartridges to replace the non-exhausted cartridges." *Id.* at *8. Finally, I found that Plaintiffs had sufficiently pleaded a

---

[3] In *Arcand*, the plaintiffs asserted that they were injured "each time they had to prematurely buy new toner cartridges for their laser printers when the printers falsely indicated the toner cartridge needed to be replaced notwithstanding the fact that usable toner remained in the cartridge." *Id.* at 288–89. The case was dismissed because the plaintiffs had not pled an ascertainable loss: "Plaintiffs do not allege what they did receive, i.e., an amount of pages less than what the manual stated, nor do they allege what spurred them to believe that the printer and its cartridges were supposed to produce more than promised in the user manual." *Id.* at 300.

causal nexus between the alleged loss and the alleged misrepresentations. Having found that Plaintiffs stated a claim under the NJCFA, I then also found that Defendant's challenge to the other state consumer fraud acts likewise failed. However, I dismissed the remaining state law claims.

In April 2013, after discovery had commenced, Plaintiffs moved to file a Second Amended Complaint (SAC). The proposed SAC eliminated certain causes of action and "incorporate[d] newly discovered facts". Mot. to Amend at ¶¶ 4–5. Defendant did not object to the filing of the SAC.

The factual allegations of the SAC are virtually identical to the FAC, with two exceptions. First, the SAC notes that each plaintiff "never changed the factory default print setting of 'auto' on [his or her] printer when [his or her] printer was rendered inoperable as stated above." SAC at ¶¶ 3–7. Second, the SAC alleges that Defendant "admitted" its deceptive practices in a brochure included with new printers. *Id.* at ¶ 25, Ex. H. The brochure states that when the printer is in the "auto" setting, "[i]f color is detected anywhere in the document, it will print the whole of the document using all the colors." SAC at ¶ 27. It also says that "Users who print primarily in black text should select Mono mode to prolong the life of their color toner cartridges." *Id.* The brochure goes on to explain that the printer "detects the life of the toner cartridges using the following two methods." *Id.* at ¶ 28. First, it describes the "optical sensor," which "checks the level at which toner in a cartridge interrupts light transmitted through windows on either side of the cartridge." *Id.* The second method is "detection by counting the rotations of the developer roller," which is described as "a function that will count the rotations of each toner cartridge's developer roller and stop the print operation when the upper rotation limit is detected." *Id.* The developer roller count can be "'turn[ed] off' . . . for [the] color

cartridges by printing in Mono mode." *Id.* Plaintiffs assert that none of this information was provided to Plaintiffs or Class Members. *Id.* at ¶ 30. "Without being informed of exactly how these modes of operation use toner, no consumer could reasonably expect that color cartridge toner would be depleted as a result of black and white and greyscale printing." *Id.* Accordingly, Plaintiffs allege that "Defendant hid the nature of the design of the Printers with respect to the need to replace three Cartridges when only one has been exhausted." *Id.* at ¶ 31.

In the instant matter, Defendant moves for summary judgment against all four named Plaintiffs. Defendant asserts that each Plaintiff lacks standing, and that each state consumer fraud claim must fail on the merits because Plaintiffs cannot demonstrate loss. Defendant also argues that three of the Plaintiffs spoliated evidence. Plaintiffs simultaneously move for class certification. Along with its Motions for Summary Judgment Defendant also moves to strike certain evidence supportting Plaintiff's motion for class certification.

First, I note that, pursuant to a stipulation between the parties, the motion for class certification and the motions for summary judgment were given the same return date. Accordingly, I must determine the order in which to decide the motions. Indeed, it is a "recognized tactic" for a defendant to move for summary judgment before a judge determines whether to certify a class. *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995). "A decision that the claim of the named plaintiffs lacks merit ordinarily, though not invariably, . . . disqualifies the named plaintiffs as proper class representatives. The effect is to moot the question whether to certify the suit as a class action unless the lawyers for the class manage to find another representative." *Id.* Furthermore, in a class action, the named plaintiff(s) are required to demonstrate Article III standing. *Warth v. Seldin*, 422 U.S. 490, 502 (1975). If the

named plaintiffs lack standing, "'none may seek relief on behalf of himself or any other member of the class." *Id.*

Moreover, because the summary judgment motions all assert that Plaintiffs lack standing, I must determine those claims before addressing the question of class certification. However, where a defendant moves for summary judgment against individual plaintiffs prior to class certification, "the defendant loses the preclusive effect on subsequent suits against him of class certification." *Cowen*, 70 F.3d at 941. Indeed, Defendant here has only moved for summary judgment on grounds relevant to the individual plaintiffs, not on grounds that would disqualify the entire class. It is therefore appropriate to decide the summary judgment motions first.

In its summary judgment motions, Defendant raises the same issues of law for the four named Plaintiffs. To avoid unnecessary repetition, before addressing the individual facts, I will summarize the applicable law and will rule on certain legal issues that are common to all or most of the motions.

## FACTS RELEVANT TO ALL MOTIONS

### Mechanisms of Brother-Brand Printers

The following facts are not disputed, unless otherwise noted. The subject Brother-brand printers each use four toner cartridges: black ("K"), magenta ("M"), cyan ("C"), and yellow ("Y"). Cooper Decl. at ¶ 6. These printers are compatible with two models of Brother-brand toner cartridges, TN-110, which are "standard" cartridges, and TN-115, which are "high yield" cartridges. *Id.* at ¶ 7. TN-110 cartridges have a page yield of 1,500 pages with 5% color coverage; TN-115 cartridges have a page yield of 4,000 pages with 5% coverage. *Id.* at ¶ 7. The term "coverage" "refers to the percentage of the surface area of the printed page where toner is

applied to the paper." Spencer Decl. at 26. In color printing, the four toners overlap to create shades; for this reason, the percentage coverage amount of each color often adds up to more than the total color coverage. *Id.* "Page yield" is defined as the number of "test pages" that a cartridge will print when tested under the specific conditions in a page yield testing protocol. *Id.* Plaintiffs' experts contend that Defendant's Service Reference Manual demonstrates that the expected page yield is linear—that is, if a cartridge will yield 1,500 pages at 5% coverage, it should yield 7,500 pages at 1% coverage. Wong Repl. Decl. at ¶¶ 2–4; Pl. Repl. Ex. H. Defendant's experts dispute that page yield is always linear. Spencer Decl. at ¶ 30(f).

The printers use two methods to determine when the end life of a toner cartridge has been reached: the "optical sensor" method and the "developer roller failsafe." *Id.* at ¶ 9; Wong Decl. at ¶ 7. As part of the optical sensor mechanism, each cartridge has two windows on either side of the cartridge. Cooper Decl. at ¶ 9. A light beam is shone through these windows; when the toner is depleted to certain levels, the sensor recognizes it, and signals "toner low" and, eventually, "toner life end." *Id.*; *see also* Wong Decl. at ¶ 7. The developer roller failsafe counts the rotations of the developer roller[4]; when a maximum number of counts is reached[5], the printer will signal "life end." Cooper Decl. at ¶ 10; Wong Decl. at ¶ 7. If for either reason any of the cartridges signals "toner life end," the printer will cease to print until the cartridge has been replaced, or until another action has been taken to override the "life end" signal; this is known as a "hard stop." Spencer Decl. at ¶ 19. If the optical sensor mechanism has caused the life-end signal, removing the cartridge and reinserting it may cause the printer to print again; the developer roller

---

[4] In printing, the developer roller assists in charging the toner, and rotates to transfer the charged toner to the printer's photoreceptive drum. Cooper Decl. at ¶¶ 22–23

[5] In the TN-110 color cartridges, the developer roller failsafe count is 33,300 rotations; in TN-115 color cartridges it is 92,500 rotations. Pl. Reply. Ex. I (Service Manual).

counter mechanism will completely prevent the printer from printing until a new cartridge is installed. Spencer Decl. at ¶ 46(c); Esterman Decl. at ¶ 17. Each cartridge has its own developer roller. Cooper Decl. at ¶ 10.

When a color page prints, the developer rollers in all three cartridges rotate simultaneously. Spencer Decl. at ¶ 46(a). This means that all three cartridges will rotate even if a given color is not being used on the page. Wong Decl. at ¶ 8. Accordingly, it is conceivable that when three new color cartridges have been inserted at the same time, all three cartridges will signal "life end" simultaneously if the developer roller failsafe reaches its maximum count. Esterman Decl. at ¶ 18. Defendant's expert, however, claims that this phenomenon is rarely experienced by customers. Spencer Decl. at ¶ 22.

The developer roller rotates a set amount of times for different functions. When a Brother 4040 printer prints in color, the developer roller rotates 18.5 for the first page, but only 5.6 times for subsequent pages. Wong Decl. at ¶ 10, Pl. Reply Ex. I. These rotations occur even if there is only a small amount of color on the page. *Id.* In addition, in "auto" mode, which is the default mode for the subject printers, grayscale images are printed using all four color cartridges. Esterman Decl. at ¶ 19. The developer rollers in all three toner cartridges also rotate 12 times when the printer is turned on. Wong Decl. at ¶ 9; *see also* Pl. Reply. Ex. I (Service Manual). Plaintiffs' experts describe these developer roller rotations as "phantom" color use, a term that Defendant disputes. Esterman Decl. at ¶¶ 19–21; Wong Decl. at ¶ 8. Because of these designed mechanisms, Plaintiffs complain that the cartridges will "prematurely" signal "life end."

The HL-4040CN and the HL-4070CDW printers can produce maintenance reports (also called "77 Reports"). Spencer Decl. at ¶ 16. These reports display a significant amount of data regarding the printer's status and use. One column displays, *inter alia*, the following data: the

total page count for the printer, the color page count for the printer, and the "average coverage" for each of the four toner cartridges currently installed in the printer. *See, e.g.*, Def. Ex. 19 (DiCuio Maintenance Report); *see also* Spencer Decl. at ¶ 27. A second column displays the last ten error messages shown by the printer, including paper jams and toner "life end" signals, as well the number of times each toner cartridge has been replaced, and the total pages printed for the "current" and the most recent "previously used" cartridges. *See, e.g.*, DiCuio Maintenance Report. The MFC-9440CN can display similar data on its control panel display. Spencer Decl. at ¶ 16(d).

**Expert Reports**

Experts for both parties conducted tests on the printers and the toner cartridges, and presented their opinions on the results. The conclusions the experts drew from these tests are, in large part, disputed. The following is a summary of their reports.

David Spencer, a printer expert for Defendant, weighed the cartridges from Plaintiff Pociluyko's printer. Spencer Decl. at ¶ 17. Spencer also conducted page yield testing using protocols developed by the International Organization for Standardization ("ISO") to test the TN-110, using printer models HL-4070CDW, HL-4040CN, and HL-4040CDN. *Id.* at ¶ 18. This testing is designed "so that printing the entire suite is equivalent to printing 5 pages each with 5% C[yan] coverage, 5% M[agenta] coverage, 5% Y[ellow] coverage and 5% K [black] coverage." *Id.* at ¶ 29. Spencer noted several "key aspects" of the testing, including that "ISO test results are not linear," meaning "if a cartridge is advertised to print 1000 pages at 5% coverage, one cannot expect that if the coverage doubles to 10%, the yield will decrease by exactly half to 500 pages." *Id.* at ¶ 30(f). Spencer concluded that the TN-110 cartridges delivered their advertised page yield, and that when one color cartridge signaled "toner life end," it did not

cause the other two color cartridges to signal "life end" simultaneously. *Id.* Spencer further opined that "if the 'toner life end' signal for a given cartridge is triggered by Optical Sensor Protection then that cartridge (barring a defect . . .) has performed in a manner consistent with its advertised page yield." *Id.* at ¶ 22. Only if users engage in "certain kinds of unusual printing behavior" will cartridges reach the developer roller failsafe before the optical sensor. *Id.*

Spencer also conducted tests which tested and confirmed the accuracy of the total page counts, color page counts, and image counts shown on the printer maintenance reports. *Id.* at ¶ 27. He further observed that the "replace counts" for the three color cartridges increased by one when a new cartridge of each color was installed. *Id.* at ¶ 28.

Spencer initially stated that he had been previously informed by Brother International Limited engineers that the "average coverage" data was not accurate." *Id.* at ¶ 27. However, he later examined the ISO testing data to determine the accuracy of the "average coverage" data. Spencer Reb. Decl. at ¶ 14. The ISO testing is designed to be comparable to printing 5 pages each with 5% coverage for each color. *Id.* Looking at maintenance reports from the beginning, middle, and end of the testing, Spencer stated that "there is no consistent movement towards 5% coverage for any of the 3 color toner cartridges as the test progressed, despite printing thousands of 5% color pages." *Id.* at ¶ 17. Spencer therefore concluded that the "average coverage" data is not accurate. *Id.* at ¶ 18. In addition, Spencer notes that the Service Reference Manual for the HL-4040CN indicates that the "average coverage" number is supposed to reset to zero when a new cartridge is installed. *Id.* at ¶ 21 (citing Def. Ex. 88). Spencer confirmed that the function reset on a Brother HL-4040CN printer in his laboratory. *Id.* at ¶ 22.

In addition, Spencer analyzed the sample documents provided by Plaintiffs in discovery to calculate the percentage coverage for all four toners on each document. Spencer Decl. at ¶ 56.

11

Defendant's Exhibit 24 ("Print Sample Coverage Analysis") is a chart showing the percentage coverage calculation of these documents, which consisted of various type of print-outs, including emails, webpages, manuals, and PowerPoint presentations. The documents showed a wide range of average color coverage, with some documents showing less than 1% coverage, while others showed up to 53.5% coverage for one color.

Plaintiffs' expert, Marcos Esterman, also conducted tests on the subject printer models. Esterman found that the optical sensor method of calculating toner life end did not completely prevent the printer from printing. Esterman Decl. at 17. Rather, when a cartridge which has signaled life end is reinserted, the printer may continue printing. *Id.* Esterman also ran a test intended to force some the cartridges to hit the roller failsafe limit. Esterman Decl. Ex. B, Test 2. This test consisted of printing at very low percentage coverages—1% cyan, 1% magenta, 0% yellow, and 1% or 0% black. *Id.* On one round, the Cyan and Magenta had the same page count at the start of testing; these cartridges signaled "toner out" simultaneously, and reinserting them did not permit the printer to start printing again. *Id.* On a second round, the cyan, magenta, and yellow cartridges were all new; all three cartridges ran out at the same page count, although no yellow was used in the print jobs. *Id.*

Esterman[6], like Spencer, also conducted tests to determine the accuracy of the "average coverage" data in the printer maintenance reports. Based on those tests, Esterman opined that "the average coverage figure is not random" but "correlates in a predictable fashion with the amount of color toner actually rendered on the page." Esterman Strike Decl. at ¶ 7. As a result of

---

[6] Esterman's testing of the "average coverage" data was raised in opposition to Defendant's Motion to Strike Portions of Kaiser Wong's and Marcos Esterman's Reply Declarations Filed with Plaintiffs' Reply in Support of Class Certification. This declaration, attachment 3 to Docket No. 117, shall hereinafter be referred to as "Esterman Strike Decl."

this correlation, Esterman stated that the average coverage data "can be used to estimate the actual coverage for the cartridge in question," because the average coverage data "exhibits distinct behavior" with regard to "low (less than 2%), nominal (2–5%), or high (over 5%) coverage. *Id.* at ¶ 8. Based on his testing, Esterman concluded that "both low and nominal coverage printing may result in average coverage values of 2% or less," *id.* at ¶ 17, while for "high coverage" printing, "the average coverage would be reported as higher than 2%." *Id.* at ¶ 19.

Plaintiffs also submitted an expert report from Kaiser Wong, an expert in the testing and development of laser printers. In his report, Wong discusses the mechanisms of the printers, *see supra*, and the "phantom" use of color caused by the developer roller. Wong Rep. at 7–8. Wong opines that "because all three color cartridges' develop[er] rollers rotate during this 'phantom' use, it is not uncommon for consumers to suddenly experience all three cartridges timing out together or in close proximity if they insert the three new color cartridges at the same time." *Id.* at ¶ 8. Wong opines that the rotation count for the developer roller failsafe end-life "are set with a lower count for the failsafe upper limit than necessary." *Id.* at ¶ 13. According to Wong, when color toner cartridges reach their life end based on the developer roller failsafe, having been used to print low area coverage (i.e. 1% to 3% coverage printing primarily single-page jobs), "there is almost always unused toner remaining in the toner cartridge which could otherwise be used." *Id.* at ¶ 14.

Wong submitted an additional "reply declaration." (Dkt. No.75(1)). In this declaration, Wong argues that Defendant's Service Reference Manual ("the Manual") demonstrates that the page yield determinations are linear, "and that the less area coverage per page on average, the more pages that are printable as page yields from the color cartridge." Wong Repl. Rep. at ¶ 2.

13

Wong further asserts that, while the Manual shows that a customer can print up to 7,500 pages at 1% coverage, the Manual also shows that "this page yield cannot be obtained because the Developer Roller Failsafe stops the cartridge from printing." *Id.* at ¶ 6. Wong notes that in the TN-110 cartridges, the developer roller failsafe is set so that the user can only obtain 1800 pages, if printing single-page jobs. *Id.* at ¶ 8. According to the Manual, a TN-110 cartridge user should be able to print 1,875 pages at 4% color coverage. *Id.* Wong asserts, therefore, that if a user prints only single-page jobs at 4% coverage, the developer roller failsafe mechanism will stop at 1800 pages, preventing the user from obtaining the full 1874 pages. *Id.* Wong further reiterates that grayscale images are frequently printed using color, and that the developer rollers turn simultaneously. *Id.* at ¶¶ 11, 14.

**STANDARD OF REVIEW: SUMMARY JUDGMENT**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party requesting summary judgment must show that a material fact is not genuinely disputed by "citing to particular materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423.

14

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that burden is met, the non-moving party has the "burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. To determine whether a genuine issue exists, the court must view the facts, and all reasonable inferences to be drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## SUMMARY JUDGMENT AGAINST PLAINTIFF DICUIO

Defendant presents three grounds for summary judgment against Plaintiff DiCuio: Article III standing, the lack of an ascertainable loss under the NJCFA, and spoliation. Following a summary of the facts of DiCuio's case, I shall address each argument.

### A. Factual Background of Plaintiff DiCuio's Claim

DiCuio, a New Jersey resident, purchased a Brother HL-4040CN printer from Staples in 2008 for $249.99 DiCuio Statement of Undisputed Material Facts ("DiCuio SUMF") at ¶ 1. This printer came with standard TN-110 toner cartridges, for which the advertised page yield is 1,500 pages at 5% coverage. *Id.* at ¶¶ 2, 10.

According to DiCuio, he purchased either eight full sets of replacement color cartridges, or eight individual cartridges; a maintenance report from DiCuio's printer (Def. Ex. 19) indicates

15

that DiCuio replaced each color cartridge six times. *Id.* at ¶¶ 4–5. On occasion, when the printer would indicate a toner cartridge was empty, DiCuio would shake that cartridge and was then able to print more pages; this indicates that the signal was triggered by the optical sensor. *Id.* at ¶ 6. Generally, though, when the printer indicated a toner cartridge was empty, DiCuio would replace only that cartridge. *Id.* at 7; DiCuio Dep. at 77:18–21. On multiple occasions, however, after replacing one color cartridge, the printer would print for only a short period of time before indicating that at least one of the other cartridges was also empty. DiCuio Dep. at 65:6–22. DiCuio also estimated that on three occasions, he had to replace all three cartridges in order to render the printer operational. *Id.* at 117:15–19.

The maintenance report from DiCuio's printer indicates that DiCuio printed a total of 13,299 color pages. DiCuio SUMF at ¶ 12; *see also* DiCuio Maintenance Rep., S.J. Mot. Ex. 19. In his deposition, DiCuio estimated that the page yield he received for the color cartridges averaged around 750 pages, and that the average color coverage of his print jobs was approximately 40%. DiCuio Dep. at 164:2, 166:10–:18. However, the printer maintenance report states that the average percentage coverage was 0.04% for cyan, 0.04% for magenta, and 0.04% for yellow. DiCuio Maintenance Rep. (Def. Ex. 19). The single sample document that DiCuio provided in discovery had a percentage color coverage of 5.81% for cyan, 5.94% for magenta, and 5.05% for yellow. Print Sample Coverage Analysis.

DiCuio continued to use his printer after becoming a party to this action in January of 2011. DiCuio SUMF at ¶ 16. While the printer tracks the number of toner replacements, and can show the page count at which toner is replaced up to the last 10 incidents, DiCuio did not keep any independent records of his toner cartridge purchases, replacements, or page yields. Def. Rep. to SUMF at ¶¶ 18–19. DiCuio testified that he was unsure if he had replaced the cartridges in the

16

printer since March 2011, but "estimated" that he had replaced the color cartridges once. DiCuio Dep. at 90:10–25. DiCiuo did not save any of the color cartridges he had replaced, but instead recycled them. *Id.* at 91:13–21; 94:6. DiCuio also did not retain receipts for his paper purchases. *Id.* at 134:20.

### B. Standing and the NJCFA

Defendant has challenged both DiCuio's standing to bring a claim and the elements of his claim under the NJCFA, specifically, the ascertainable loss. Because these arguments are interrelated, I will address them together.

To satisfy the "case or controversy" standing requirement under Article III of the Constitution, a plaintiff must establish that he or she has suffered a cognizable injury that is causally related to the alleged conduct of the defendant and is redressable by judicial action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury element, commonly referred to as "injury-in-fact," requires that the plaintiff suffered "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (internal quotation marks and citations omitted). "Particularized" means that "the injury must affect the plaintiff in a personal and individual way." *Id.* at 560 n.1. "The party invoking federal jurisdiction bears the burden of establishing these elements" and at the summary judgment stage, "must 'set forth' by affidavit or other evidence 'specific facts,' Fed. R. Civ. P. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Id.* at 561.

Defendant asserts that Plaintiff DiCuio lacks standing because he "was not injured by purchasing Brother-brand products." DiCuio S.J. Mot. at 10. Defendant points to this Court's earlier decision, which stated that Plaintiffs had sufficiently alleged "'out of pocket' losses

attributable to 'expend[ing] funds to purchase additional color toner cartridges to replace the non-exhausted cartridges.'" *Id.* (quoting *DiCuio v. Brother Int'l Corp.*, 2012 U.S. Dist. LEXIS 112047, *24 (D.N.J. 2012)). Defendant argues that the undisputed facts show that "Plaintiff never did that" because the TN-110 cartridges that DiCuio used "printed 13,299 color pages at 40% average coverage." *Id.* This amount, according to Defendant, exceeds the advertised performance of the cartridges. *Id.*

For similar reasons, Defendant asserts that DiCuio did not suffer an "ascertainable loss," a required element of an NJCFA claim. *Id.* at 19. "To state a cause of action under the [NJ]CFA, a plaintiff must allege: (1) an unlawful practice by the defendants; (2) an ascertainable loss by plaintiff; and (3) a causal nexus between the first two elements—defendants' allegedly unlawful behavior and the plaintiff's ascertainable loss." *Arcand v. Brother Intern. Corp.,* 673 F.Supp.2d 282, 296 (D.N.J. 2009) (quoting *Parker v. Howmedica Osteonics Corp.,* Civ. No. 07–02400(JLL), 2008 WL 141628, at *2 (D.N.J. Jan.14, 2008)).

To demonstrate an ascertainable loss, the plaintiff must establish an "actual loss," that is "quantifiable or measurable," or "real and demonstrable," as opposed to "hypothetical or illusory" or "speculative." *Thiedemann v. Mercedes–Benz, USA, LLC*, 183 N.J. 234, 248, 252, 255 (2005). As I explained previously in my 2012 decision, "there is little that illuminates the precise meaning that the Legislature intended in respect of the term 'ascertainable loss' in [the NJCFA], and New Jersey courts have been chary to ascribe the term a precise meaning," *DiCuio*, 2012 WL 3278917, at *7. However, "[t]he mere fact that a[] . . . defect arises does not establish, in and of itself, an actual and ascertainable loss to the . . . purchaser." *Thiedemann*, 183 N.J. at 251. Nor is the fact that a consumer may be "inconvenienced by problems" sufficient. *Id.* On the

18

other hand, an "estimate of damages, calculated within a reasonable degree of certainty will suffice to demonstrate an ascertainable loss." *Id.* at 249.

Generally, an ascertainable loss occurs "when a consumer receives less than what was promised." *Union Ink Co., Inc. v. AT & T Corp.,* 352 N.J. Super. 617, 646 (App. Div. 2002). In New Jersey courts, a plaintiff may use two methods to show an ascertainable loss: the benefit of the bargain rule or the out of pocket rule. *DiCuio*, 2012 WL 3278917, at *7. "First, the 'benefit of the bargain' rule allows recovery for the difference between the price paid and the value of the property had the representations made been true"—that is, the cost for plaintiff to obtain what he reasonably believed he was purchasing. *Romano v. Galaxy Toyota*, 399 N.J. Super. 470, 483 (App. Div. 2008). Under this theory, the plaintiff must show the "the difference between the [product] she received and the [product] as represented at purchase." *Id.* at 300. "[T]he "out of pocket" approach, [] provides recovery for the difference between the price paid and the actual value of the property acquired." *Id.*

DiCuio counters that "the [class] printers are designed with a number of undisclosed, deceptive and unconscionable cartridge life-depleting mechanisms, which in concert with [Defendant]'s misrepresentation regarding yield work to defraud the consumer." DiCuio Opp. at 3. Relying on the Plaintiffs' expert reports, DiCuio identifies these mechanisms as (1) the developer roller failsafe "that is unnecessarily and arbitrarily set at a low rotation maximum limit," (2) that when in "AUTO" mode, the developer roller rotates and actual color toner is used to print grayscale images; (3) the developer roller count increases for all color cartridges "irrespective of which color toners are being used to print color on a page"; (4) the developer roller count increasing "irrespective of whether the page has a single color character or a whole page of color"; (5) the first page of a document using 18.5 developer roller rotations, while

subsequent color pages use only 5.6 rotations; and (6) other "phantom rotation counts" for "various non-printing occurrences" such as turning the printer on. *Id.* at 3–4. In short, DiCuio posits that Defendant designed the developer roller to unnecessarily rotate in order the reach the failsafe limit. In that regard, Plaintiffs' expert Wong opines that "it is not uncommon for consumers to experience three color cartridges hitting life-end due to the phantom uses of the developer roller." *Id.* DiCuio also cites Esterman's declaration that the developer roller rotates even if there is only a small amount of coverage on the page. *Id.* Relying on his experts, DiCuio argues that "the developer roller limit for the class printers is set at a level far below a level at which quality and damage considerations would become relevant." *Id.* at 19.

DiCuio further contends that the developer roller failsafe caused his cartridges to "prematurely" signal "life end." DiCuio Opp. at 21 Plaintiffs' experts opined that "[i]f one cartridge were to reach the optical sensor limit first and be replaced then, when replaced, the developer roller count of the replacement cartridges would be out-of-sync with the other two color cartridges, such that only two of the cartridges would signal 'toner life end' simultaneously." *Id.* In fact, to defeat summary judgment, DiCuio relies on his printer maintenance report, which shows the simultaneous life end of the cyan and yellow color cartridges at both page counts 10433 and 16601. *Id.* at 9 DiCuio contends that the "life end" signals mean the cartridges were replaced simultaneously at both of those page counts. *Id.* at 11. DiCuio then asserts that "mathematically it is virtually impossible for the subject printers to experience multiple cartridge life-end signals that are not due to the developer roller failsafe mechanism." *Id.* at 12.[7] DiCuio argues that the alternative explanations suggested by

---

[7] Defendant points out that the cyan cartridge additionally signaled "life end" at page count 13549, and argues that, if the cyan cartridge was replaced at that time, the simultaneous life-end signals for the cyan and yellow cartridges at page 16601 could not have been caused by the

Defendant's expert are incorrect, and that the only explanation for these simultaneous life-ends is the developer roller failsafe. Id. at 13–15.

Defendant's experts dispute many of these claims, and more generally dispute the way the developer roller failsafe mechanism affects users. But even accepting as true, for the purpose of this motion, Plaintiffs' experts' opinions that the developer roller mechanism may cause the color toner cartridges to signal "life end" sooner than is necessary to replace the cartridges, Plaintiff nonetheless still fails to show loss. Indeed, Plaintiffs' expert statements are largely general and non-specific—they do not discuss whether any individual plaintiff suffered a loss. Rather, the experts primarily focus their opinions on how the design of the developer roller may, in some instances, unnecessarily rotate so that the printer would reach the failsafe mechanism. Assuming it is true that the toner cartridges reached life-end more quickly than they would have in the absence of the developer roller failsafe, this fact, in and of itself, is insufficient to show an "ascertainable loss," under either theory. A plaintiff must provide at least an "estimate of damages, calculated within a reasonable degree of certainty." *Thiedemann*, 183 N.J. at 249.

Similarly, while the experts dispute the reasons for the simultaneous life ends of the cartridges, the fact that DiCuio may have experienced simultaneous life-ends of two cartridges, even if caused by the developer roller failsafe, is not an ascertainable loss under either theory. Plaintiff must show that he received less than he was promised. In other words, if, at the time the cartridges simultaneously signaled "life end," DiCuio had received the full value of his purchase,

---

developer roller failsafe. Def. Repl. Br. at 13.  DiCuio, however, asserts that the "life end" signal at page 13549 was due to the optical sensor, and that DiCuio "removed, shook and reinserted" the cartridge to render the printer operational. Id. at 12. However, even if the simultaneous life ends were undisputedly due to the developer roller failsafe, this would still be insufficient to show an ascertainable loss without evidence on page yield and average coverage. *See infra.*

i.e. the represented page yield[8], the fact that the cartridges needed to be replaced together would not be a loss. Hypothetically, even if DiCuio could show that the developer roller caused simultaneous life-ends of his cartridges, and that the cartridges still contained 75% of the toner, he nonetheless would not have suffered a loss, so long as he received what he was promised by Defendant.

Here, the promise that Dicuio challenges as false is the page yield—that the TN-110 cartridges would yield 1500 pages at 5% coverage. The only support DiCuio relies on to show page yield for his printer is the maintenance report produced by his Brother 4040CN printer. The report shows that at the time the printer was examined by the experts, it had printed 13,299 color pages. *See* Def. Ex. 19, pg. 457. It also shows that the "current cyan" cartridge had printed 1500 pages; the "current magenta" cartridge had printed 1456 pages; and the "current yellow" cartridge had printed 1592 pages. *Id.* The previous cyan, magenta, and yellow cartridges had printed 2346, 2316, and 2481 pages, respectively. *Id.* Finally, the "average coverage" statistic showed 0.04% for each color. *Id.*

 DiCuio suggests that Defendant's Service Reference Manual explains that page yield is linear, and that at 1% coverage, a user should expect to receive 7,500 pages. DiCuio Opp. at 20–21. Because the printer maintenance report showed that he received less than 1% coverage for each color, DiCuio asserts that he should have received at least 7,500 pages for each cartridge

---

[8] Indeed, this Court came to the same conclusion in *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282 (D.N.J. 2009). There the plaintiffs argued that they suffered a loss where "large amounts of useable toner remain in purportedly empty toner cartridges." *Id.* at 297. I found that the Complaint failed to allege an ascertainable loss, because "Plaintiffs do not allege why they believed that the toner's life was tied to the amount of ink in the cartridge," when the user manual stating that the cartridge "printed up to a certain number of pages." *Id.* at 200–01. I further commented Plaintiffs cannot "attach his or her own subjective value to a product without reference to what was expected at the time of purchase by a reasonable consumer." *Id.* at 302.

used. Having purchased six sets of color cartridges, he contends that he should have received at

least 45,000 color pages. *Id.* at 21. Further, DiCuio argues that he also experienced an out-of-

pocket loss "every time [he] had to purchase replacement color cartridges, because the prior

cartridge prematurely hit life-end without delivering the advertised yield." *Id.* at 21. In that

regard, DiCuio claims that precise damages can be calculated for the previously used cartridges.

*Id.* at 22.[9]

      While Defendant disagrees with DiCuio's interpretation of the Service Reference

Manual, even if the page yield does have a linear relationship with the average coverage number,

DiCuio has not proven his claim. Defendant also disagrees with DiCuio's reliance on the 0.04%

average coverage number. Indeed, Defendant challenges the admissibility of this data under Fed.

R. Evid. 901(b)(9).[10] However, I do not find it necessary to address the admissibility of the

---

[9] The maintenance report shows that a "previously used" yellow cartridge—the one with the highest page count—printed 2481 pages. *Id.* Because, DiCuio asserts, he should have received a minimum of 7,500 pages, he only received 33% of the color pages promised. *Id.*

[10] Defendant argues that the "average coverage" number cannot be authenticated under Fed. R. Evid. 901(b)(9), which requires that evidence can be authenticated by "describing a process or system and showing that it produces an accurate result." *Id.* at 7. According to Defendant, evidence from Defendant's expert Spencer shows that this data does not accurately report coverage. *Id.* at 8. Moreover, the evidence shows "average coverage" data is not cumulative, but resets to zero when a new cartridge is inserted. *Id.* at 11.

Indeed, evidence involving computerized data "raise[s] unique issues concerning accuracy and authenticity." Manual for Complex Litigation (Fourth) § 11.447 (2004).  However, Defendant's challenges to the "average coverage" data—namely, its accuracy and the fact that the number resets when a new cartridge is installed—do not fit within the authentication rule. For example, where a party challenged the accuracy of the results of a computer program, the Ninth Circuit held that "[a]ny question as to the accuracy of the [evidence], whether resulting from incorrect data entry or the operation of the computer program, . . . affect[s] only the weight of the printouts, not their admissibility ." *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988). Similarly, the fact that the "average coverage" number resets with each new cartridge only limits its probative value. "[F]or authentication purposes, Rule 901(a) does not require the document to be probative of a particular fact." *Lexington Ins. Co.*, 423 F.3d at 329.

"average coverage" number at this time, because I find that this number simply does not prove what DiCuio alleges—that all six of the cartridges he purchased resulted in an average coverage of 0.04%. Rather, the uncontroverted evidence submitted shows that the "average coverage" number resets to zero when a new cartridge is inserted. Def. Ex. 88 (p. 2-12); Spencer Reb. Decl. ¶ 22. Defendant's Service Reference Manual (Def. Ex. 88) shows that "when a new toner cartridge is inserted after 'Toner Life End' is displayed," the "coverage for each toner cartridge" will reset to zero. Testing conducted by Defendant's expert Spencer confirmed that the number, in fact, resets when a new cartridge is inserted. Spencer Reb. Decl. ¶ 22. Accordingly, the "average coverage" number only displays the average coverage for the currently installed toner cartridge. DiCuio has not provided any evidence disputing this material fact.

Indeed, while the report shows the number of pages printed and the average coverage for the "current" cartridges, there is nothing to show how many more pages the cartridges might print or what the average would be. The report also shows the number of pages printed in connection with the "previously used" color cartridges. However, contrary to DiCuio's assertion, the report does not show what the "average coverage" was for those cartridges. DiCuio's argument is entirely reliant on the "average coverage" number in the printer report. Yet this "average coverage" number cannot prove the page yield DiCuio should have received from all of his cartridges, over the lifetime of the printer. Based on this evidence alone, a reasonable jury could not find that DiCuio suffered an "ascertainable loss."

The only evidence DiCuio submits which supports his claim that the developer roller failsafe results in an ascertainable loss is the opinion of his expert, Wong. According to Wong, a user who prints only single-page print jobs will invariably suffer a loss if his or her average color coverage is 4% or less. Wong Decl. at ¶ 8. However, Wong's conclusions are drawn solely from

the technical limits described in Defendant's Service Reference Manual.[11] *See id.* These limitations do not reflect the real-life printing habits of consumers, much less provide evidence that DiCuio's printing habits would lead to such results. Indeed, it is unlikely that most users are printing only single-page jobs—DiCuio, for example, stated that most of his print jobs were four to five pages. DiCuio Dep. at 119:17–19. Even if Wong's opinion is accurate with respect to users who primarily print single-page jobs—and because DiCuio was not such a user—this evidence does not prove that DiCuio suffered an ascertainable loss.

Moreover, the evidence submitted by DiCuio tends to show that he did receive the advertised page yield. DiCuio provided a single document sample in discovery, which, when analyzed, showed color coverage of 5.81% for cyan, 5.95% for magenta, and 5.05% for yellow.[12] If these numbers are an accurate representation of his average coverage, then DiCuio received the advertised yield.[13] While DiCuio argues that the single document is not representative of his printing habits, there is no other evidence to show that his average color coverage for all of his used cartridges was lower. Indeed, DiCuio's own estimation was that his color coverage was approximately 40%. *See* DiCuio Dep. at 166:10–18.

DiCuio thus has failed to demonstrate the average coverage of his printed documents, and therefore he cannot show the corresponding page yield he should have received from each

---

[11] The manual, notably, is not distributed to customers, but only to technicians who fix Brother printers.

[12] In their reply brief, Defendant gives the percentages as 11.2% for cyan, 10.2% for magenta, and 10.1% for yellow, stating that the original analysis was "based on the 2-page copy produced by Plaintiff instead of the original 1-page PDF file." Either number, though, shows a percentage of coverage higher than 5%.

[13] At 5% coverage, DiCuio was entitled to receive 1,500 pages per cartridge. Using fewer than seven sets of cartridges, DiCuio printed 13,299 pages, an average of 1,900 pages per set.

cartridge. Without this information, I cannot ascertain what loss, if any, DiCuio suffered from the alleged misrepresentations or omissions of Defendant.

Because the record does not show a loss which is "capable of calcuation," *see Thiedemann*, 183 N.J. at 793, DiCuio's New Jersey Consumer Fraud Act claim must be dismissed. Furthermore, without any admissible evidence showing either reduced page yield or which, if any, of the printer cartridges were purchased to replace non-depleted cartridges, DiCuio has not shown that he suffered an injury-in-fact. DiCuio therefore also lacks standing to proceed with the claim. To the extent that Defendant acted wrongfully in the design of the toner cartridges, DiCuio has failed to show that he suffered any harm from Defendant's actions. Accordingly, Defendant's Motion for Summary Judgment against DiCuio is granted.

## C. Spoliation

Having found in favor of Defendant, I need not address Defendant's alternative argument that DiCuio's claims should be dismissed because he allegedly engaged in spoliation of evidence by discarding his used color cartridges, and failing to preserve his receipts, make notes, or keep records. DiCuio S.J. Mot. at 8. For the sake of completeness, though, I will make two comments. First, "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably forseeable litigation." *Mosaid Technologies, Inc. v. Samsung Electronics Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004). Accordingly, Defendant's allegation that DiCuio failed to keep notes on his printer usage cannot constitute spoliation; failing to create evidence does not constitute spoliation.

Moreover, while DiCuio's failure to preserve his toner cartridges could have prevented Defendant from analyzing such cartridges to disprove Plaintiffs' claims, it is clear that DiCuio recycled his cartridges as a matter of routine. Spoliation does not occur where "the destruction

was a matter of routine with no fraudulent intent." *Bull v. United Parcel Serv.*, 665 F.3d 68, 79 (3d Cir. 2012). Dismissal for spoliation is therefore unwarranted. As such, Defendant's request for fees in connection with the alleged spoliation, is denied.


**SUMMARY JUDGMENT AGAINST PLAINTIFF BRYANT**

Defendant argues that summary judgment should be granted against Plaintiff Angela Bryant ("Bryant") on three grounds. First, Defendant argues that Bryant lacks standing. Second, Defendant asserts that the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA"), rather than the NJCFA, applies to Bryant's claim, and that Bryant cannot show actual damages or causation under that statute. Finally, Defendant asserts that Bryant engaged in spoliation. After discussing the factual background of Bryant's claims, I shall address each argument. However, because the arguments for standing and for "actual damages" under the Illinois CFA are intertwined, I will address the choice of law question first.

### A. Factual Background

Plaintiff Angela Bryant is an attorney and a resident of Illinois. Bryant SUMF at ¶ 8. Bryant, or her husband, purchased a Brother-brand printer, model MFC-9440 (the "Bryant printer") in December 2008 from a Staples store in Illinois; the Bryant printer came with one black and three color toner cartridges, all TN-110s. *Id.* at ¶ 9–10. Bryant produced records for 12 color cartridge purchases, which showed that she purchased two complete sets of color cartridges, multiple single cartridges, and on one occasion, purchased two colors together. *Id.* at ¶ 12. While she may have purchased more cartridges than the records indicated, Bryant could not produce any other records. *Id* at ¶ 13. Bryant indicated that it was generally her practice to purchase toner cartridges only when the cartridge ran out. Bryant Dep. at 94:6–11. However, she

could not recall if all three colors had ever run out at the same time, though she stated they would run out "within the same period of time." *Id.* at 96:11–19. Bryant acknowledged that on the occasions where she purchased three color cartridges simultaneously, she "may have simply just purchased them at that point because maybe I did want to have them already in place. I'm not certain." *Id.* at 95:2–4. On multiple occasions, after seeing the "toner life end" signal, Bryant would shake the cartridge before reinserting it, and would be able to print more pages. Bryant Dep. at 175:23 to177:19.

Bryant used the printer for both work-related and personal printing. *Id.* at ¶ 16. Her color printing, which accounted for approximately 40% of her printing, sometimes included documents with a high percentage of color toner. *Id.* at ¶¶ 17–18. Bryant estimated that her average print job was approximately 5 pages. Reply to Bryant Statement of Undisputed Material Facts (hereinafter "Bryant Repl. SUMF") at ¶ 19. Bryant submitted "a collection of random documents that [she had] printed off of [her] Brother printer," which she stated were "typical to me." Bryant Dep. at 19:15–17, 35:13. These documents showed a range of "average coverage" from a single-page "syllabus" with .64% cyan, .56% magenta, and 0% yellow, to a thirty-eight page PowerPoint presentation with 53.5% cyan, 47.4% magenta, and 33.7% yellow. Def. Ex. 24 ("Print Sample Coverage Analysis").

The Bryant printer can display data, including total page count and total color page count. Bryant SUMF at ¶ 24. In April 2013, Defendant's expert consultants viewed and photographed this data, which showed the following: the total page count of documents was 23,700; the total color page count was 9,761; there were 5 replacements of the magenta and yellow toner cartridges, and 4 replacements of the cyan toner cartridges. *Id.* at ¶¶ 24–25. Like the maintenance report, the display also showed the "average coverage" data for each color: 0.05% for cyan,

0.04% for magenta, and 0.51% for yellow. Pl. Repl. Ex. X (Display Pictures from Bryant Printer). According to the Service Reference Manual, the "average coverage" data in the MFC-9440 resets to zero when a new cartridge is installed. Def. Ex. 88 (p. 2-12).

Bryant became a plaintiff in this lawsuit in December 2011. Bryant SUMF at ¶ 27. She continued to use her printer up until April 2013, when she shipped it to her counsel's office. *Id.* at ¶ 28. She continued to purchase replacement cartridges as well. *Id.* at ¶ 29. Plaintiff did not provide any of her used cartridges in discovery. Bryant Repl. SUMF at ¶ 33.

### B. Choice of Law

The SAC is not clear as to whether each Plaintiff asserts only the claims from his or her home state, or whether all Plaintiffs join in all the claims. Plaintiffs' briefing on the summary judgment motions shows each Plaintiff asserts a claim under the NJCFA, as well as under the relevant consumer fraud statute of his or her own state. Defendant, however, argues that Bryant and the other out-of-state Plaintiffs may not bring a claim under New Jersey law, but only under the laws of their own states.

As a federal court sitting in diversity, I must apply the choice-of-law rules of New Jersey, the forum state, which consists of a two-part "most significant relationship" test. *Maniscalco v. Brother Internat'l Corp.*, 709 F.3d 202, 206 (3d Cir. 2013). The first part of the test "is to determine whether or not an actual conflict exists between the laws of the potential forums." *Id.* That is, the court must "examin[e] the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." *P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008). In this context, I note that, contrary to Bryant's assertion, "[c]ourts have recognized that significant conflicts exist between the NJCFA and the consumer protection statutes of other states." *In re Mercedes-Benz Tele Aid Contract Lit.*, 257 F.R.D. 46, 63 (D.N.J. 2009); *see also*

*Fink v. Ricoh Corp.*, 365 N.J. Super. 520, 570–584 (Law Div. 2003) (illustrating "the numerous differences between New Jersey law and that of the other states in the area of consumer fraud.").

According to Defendant, "there are substantive conflicts between the NJCFA and Illinois' consumer protection statute," namely that the NJCFA provides the right to a jury trial, while the Illinois law does not; the NJCFA does not require reliance, while the Illinois law does; and that the NJCFA mandates attorney's fees, while the Illinois statute permits fees, but only in the discretion of the judge. *Id.*

Bryant asserts that there are no substantive conflicts between New Jersey and Illinois law. According to Bryant, there is a right to a trial by jury in federal court for causes of actions under the Illinois Consumer Fraud and Deceptive Business Practices Act (hereinafter "Illinois CFA.") Bryant Opp. at 17. Bryant further argues that the Illinois CFA does not require reliance, but parallels the causation requirement under the NJCFA. *Id.* at 18. Bryant states that the attorney's fee provision does not create a conflict because "it is difficult to see how a court applying ICFA could not award plaintiff attorneys' fees once liability was found on the subject consumer fraud." *Id.* Bryant additionally contends that both laws prohibit similar acts. *Id.*

Bryant's argument lacks merit. Both New Jersey state and federal district courts have found a conflict between the NJCFA and the Illinois CFA. *See Fink v. Ricoh Corp.*, 365 N.J. Super 520, 573 (Law Div. 2003); *In re Bayer Phillips Colon Health Probiotic Sales Practices Litig.*, Civ. No. 11-3017, 2014 WL 5776153, at *4 n. 3 (D.N.J. Nov. 6, 2014). In *Fink*, the New Jersey Superior Court noted that Illinois's consumer fraud statute does not provide a right to jury trial. 365 N.J. Super. at 573. And, in *Bayer Phillips*, the district court found that the relevant differences were the right to a jury trial and further that the NJCFA provides for treble damages;

the Illinois CFA, in contrast, "is aimed primarily at compensating for actual damages." 2014 WL 5776153, at *4 n. 3.

I agree that a conflict exists. It is true that the Northern District of Illinois has found that the Seventh Amendment requires a jury trial on Illinois CFA claims when such claims are brought in federal court, *see Cellular Dynamics, Inc. v. MCI Telecommunications Corp.*, 1997 WL 285830 at *9 (N.D. Ill. May 23, 1997); this limits the conflict on that issue. However, there is a conflict in the damages remedy. Treble damages are mandatory under the NJCFA, *see Ramanadham v. N.J. Mfgrs. Ins. Co.*, 188 N.J. Super. 30, 32 (App. Div. 1982). In contrast, under the Illinois CFA, any punitive damages are not only discretionary, but in some courts are awarded "only for conduct that is outrageous, either because the defendant's motive was evil or the acts showed a reckless disregard of others' rights." *Kirkpatrick v. Strosberg*, 894 N.E. 2d 781, 768 (App. Ct. Ill. 2008). Furthermore, the NJCFA's provision of mandatory attorney's fees presents a conflict to the Illinois CFA's allowance of discretionary fees. *Compare Krautsack v. Anderson*, 223 Ill. 2d 541, 554 (2006) (listing factors trial court may consider in granting fees) *with* N.J. Stat. Ann. 56:8-19 ("In all actions under this section . . . the court shall also award reasonable attorneys' fees."). I therefore find that there are differences in the substance of the two laws, and they are, thus, in conflict.

Having found that a conflict exists between the laws of different states, "the court must determine which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco*, 709 F.3d at 206. The factors to consider are taken from the Restatement (Second) of Conflict of Law § 148. *Id.* According to the Restatement, "when the plaintiff's action in reliance took place in the state where the false representations were made and received, there is a presumption that the law of that state applies." *Id.* at 207 (internal quotation makes omitted). However, "when the

31

plaintiff's action in reliance takes place in a different state than where the false representations

were made and received" the court must weigh the following factors:

> (a) the place, or places, where the plaintiff acted in reliance upon the
> defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and
> place of business of the parties,
> (e) the place where a tangible thing which is the subject of the
> transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a
> contract which he has been induced to enter by the false
> representations of the defendant.

> [*Id.*]

In *Maniscalco*, the Third Circuit determined the choice of law in a case where the

plaintiff, who resided in South Carolina, had sued BIC, a Delaware corporation with its principal

place of business and headquarters in New Jersey. *Id.* Initially, the Third Circuit found that

where a plaintiff "received and relied on BIC's representations in his home state . . .  and there

was no evidence demonstrating that BIC made any omissions or misrepresentations in [that

state], the District Court properly applied" the second test. *Id.* at 208.

Next, the *Maniscalco* court explained that "three of the six contacts weigh strongly in

favor of applying South Carolina law", namely: "(a) the place where [the plaintiff] acted in

reliance upon BIC's representations, (b) the place where [the plaintiff] received the

representations, and (e) the place where a tangible thing which is the subject of the transaction

between the parties was situated at the time." *Id.* Factor (f) did not apply, and factor (d)

"weigh[ed] slightly in favor of applying South Carolina law" under § 148 cmt. i, which states

that where there is pecuniary loss "'[t]he domicil, residence and place of business of the plaintiff

are more important than are similar contacts on the part of the defendant' because 'financial loss

will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship.'" *Id.* Finally, the Third Circuit found that "[a]ccepting [the plaintiff]'s premise that there were actionable omissions by [Defendant] at its headquarters in New Jersey, we conclude that this single contact—factor (c)—does not warrant applying New Jersey law." *Id.*

Defendant, applying the six factors set forth above, argues that Illinois has the most significant relationship to Bryant's claims. *Id.* at 30. Defendant further asserts that the alleged wrongdoing "did not even occur at BIC's headquarters in New Jersey," but instead that Defendant's parent company, Brother Industries, Ltd. ("BIL"), a Japanese corporation, is responsible for the alleged misrepresentation. *Id.* at 31.

Bryant argues two factors that support a choice of New Jersey law: that Defendant requires consumers who make purchases from its online site BrotherMall.com, and customers who register their printers through www.brother-usa.com/RegisterMyBrother, are required to submit to New Jersey Law. Bryant Opp. at 19. Bryant additionally contests Defendant's claim that BIL, rather than Defendant, is responsible for the claims at issue in this case. *Id.* at 15. According to Bryant, Defendant's senior executives are all located in New Jersey, including the Senior Vice President of Marketing who is ultimately responsible for Defendant's advertising and the language on the printer and toner cartridge boxes. *Id.* at 16. Bryant also asserts that personnel in New Jersey are "involved in writing the User's Guides for the subject printer(s) in that they provide input to parent BIL in their writing of the guides, they review the guides and they approve the guides." *Id.*

Because Bryant purchased her printer in Indiana, and there is no evidence demonstrating that Defendant made any omissions or misrepresentations in that state, I will apply the six-factor test employed by the Third Circuit in *Maniscalco*. Like in *Maniscalco*, these factors weigh in

33

favor of applying Illinois law. Under factor (a), the place, or places, where the plaintiff acted in reliance upon the defendant's representations, Bryant purchased her printer and toner cartridges in Illinois, and under factor (b), she also received the representations made by Defendant in Illinois. These same facts apply to factor (e)—the place where a tangible thing which is the subject of the transaction between the parties was situated at the time. Factor (f) does not apply, as there is no contractual claim. *Id.* Factor (d)—the domicil, residence, nationality, place of incorporation and place of business of the parties—also weighs in favor of applying Illinois law, as "financial loss will usually be of greatest concern to the state with which the person suffering the loss has the closest relationship." *Id.* Finally, as in *Maniscalco*, assuming that Defendant engaged in actionable omissions or misrepresentations at its headquarters in New Jersey, this one factor is not sufficient for New Jersey law to apply over the law of Plaintiffs' home states. *Id.*

The fact that Defendant required parties who went to its websites to submit to New Jersey law does not change this analysis. The "Terms of Service" for the websites state that the Terms govern "your purchase of products on this Site" or "your use of this website." *See* Pl. Resp. Exs. S, T, U.  Bryant does not claim to have purchased her printer from Defendant's online site, nor to have registered her printer through Defendant's website. Therefore, the choice of law provisions of these websites do not apply. Moreover, these choice of law provisions do not, in and of themselves, give New Jersey a more significant interest in the litigation than a plaintiff's home state.

Therefore, I will apply Illinois law to Bryant's claim.

**B. Standing and Actual Damages Under the Illinois CFA**

Defendant has challenged both Bryant's standing to bring a claim and the elements of her claim under the Illinois CFA, specifically, the actual damages element. Because these arguments are interrelated, I will address them together.

I have already discussed the elements of standing, *supra*, in section B of DiCuio's Motion. The elements of a claim under the Illinois CFA are: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.* 835 N.E.2d 801, 850 (Ill. 2005). "In order to sustain a private cause of action under the [Illinois Consumer Fraud] Act, a plaintiff must prove that he or she suffered 'actual damage as a result of a violation of [the] Act.'" *Id.* at 858–59 (quoting 815 Ill. Comp. Stat. 505/10a(a)). "Because actual damages is an element of the claim, plaintiff must allege that she has been harmed in a concrete, ascertainable way." *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d 954, 957 (N.D. Ill. 2008). That is, the alleged deception must have made the plaintiff "tangibly worse off"; the damage may not be "predicated on mere speculation, hypothesis, conjecture or whim." *Id.*

In one Illinois case, as an example of the loss element, the plaintiff had purchased jewelry on QVC, and alleged that QVC's listed "retail value" overstated the prevailing market prices for the products. *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190, 1192 (Ill. App. 2008).The Illinois court found that the plaintiff had not suffered actual damage because "the prices she paid were indeed lower than the prices at which she purportedly could have purchased comparable products in the marketplace." *Id.* at 1197. Accordingly, the plaintiff "paid less than the actual value of the property and, therefore, had no pecuniary loss in the bargain." *Id.* at 1198.

As with DiCuio, Defendant argues that Bryant lacks standing, because she was not injured by purchasing Brother-brand products. Bryant S.J. Mot. at 15. According to Defendant, Bryant "received a yield of color pages from fewer than six full sets of color cartridges that met or exceeded the collective advertised performance." *Id.* Defendant points out that one of Bryant's sample documents showed extremely high color coverage. *Id.* at 4. In addition, Bryant testified that she did not recall ever seeing the printer signal that all three cartridges went out at the same time. *Id.* at 16. Thus, Defendant contends that, because Bryant's cartridges exceeded the advertised page yield, Bryant did not suffer "actual damages," as required by the Illinois CFA. *Id.* at 35.

In response to Defendant's position, Bryant raises largely the same arguments as DiCuio. Based on Plaintiffs' expert opinions, Bryant asserts that her printer is designed such that the developer roller unnecessarily rotates so that the printer will reach the failsafe limit. *See* Bryant Opp at 1–3. In addition, like DiCuio, Bryant claims that the evidence shows she experienced simultaneous life-ends of multiple cartridges. *Id.* at 6. She notes that on two occasions, she purchased three color cartridges at one time, and that on an additional occasion, she purchased two color cartridges at the same time. *Id.* at 5. Because her deposition testimony indicates that her habit was to only purchase toner cartridges as needed, Bryant argues that these purchases indicated simultaneous life-ends of the toner cartridges. *Id.* at 5–6.

Defendant, again, disputes the claims made by Plaintiffs' experts. However, as with DiCuio, I accept as true for this motion the claim that the developer roller mechanism may cause the color toner cartridges to signal "life end" sooner than is necessary to replace the cartridges. Nonetheless, as I discussed with DiCuio, the experts' generalized opinions are insufficient to show that Bryant suffered actual damages from this mechanism. The fact that the toner cartridges

reached life-end more quickly than they would have in the absence of the developer roller failsafe is, in and of itself, insufficient to show "actual damages." Similarly, while I accept for the purpose of this motion that Bryant may have experienced simultaneous life-ends of her cartridges[14], the simultaneous life-ends of the cartridges do not show that Bryant experienced any "actual damages." As with ascertainable loss under the NJCFA, if Bryant received the full value of her toner cartridges—i.e., the represented page yield—she cannot claim to have suffered any concrete ascertainable harm resulting from Defendant's alleged deceptive act or practice.

Also like DiCuio, Bryant alleges that Defendant deceived her regarding the page yield; that is, she did not obtain the advertised 1500 pages at 5% coverage promised for TN-110 cartridges. The only support Bryant relies on to show page yield for her printer is the data displayed by her printer, which is equivalent to the maintenance report produced by other Plaintiffs' printers. *See* Spencer Decl. at ¶ 16(d). Photographs of this data display show that at the time the printer was examined by the experts, it had printed 9,761 color pages. *See* Def. Ex. 21, pg. 510. The data display also showed that the "average coverage" for each color was 0.05% for cyan, 0.04% for magenta, and .51% for yellow. Pl. Repl. Ex. H, p. 3–5.[15] Relying on Defendant's Service Reference Manual to show that page yield is linear, and that at 1% coverage, a user should expect to receive 7,500 pages, Bryant calculates that she was "entitled to print at least 75,000 color pages" with her five full sets of color cartridges. *Id.* at 10. Bryant

---

[14] I note, however, that Bryant also testified that she may have bought multiple cartridges simply to have them on hand. Def. Opp. at 14

[15] Unlike the maintenance reports provided from the other Plaintiffs' printers, no evidence has been provided to show the number of pages printed for the current or previously installed cartridges.

additionally asserts that she "is entitled to diminished value of the printer she purchased . . . because it is designed to deprive the consumer of the advertised color yield." *Id.* at 11.

This argument is substantially the same as DiCuio's argument under the "ascertainable loss" prong of the NJCFA, and suffers from the same flaw: the uncontroverted evidence submitted shows that the "average coverage" number resets to zero when a new cartridge is inserted. Def. Ex. 88 (p. 2-12); Spencer Reb. Decl. ¶ 22. Accordingly, the "average coverage" number only displays the average coverage for the currently installed toner cartridge. Even assuming that the relationship between coverage and page yield is linear, as Plaintiffs contend, this "average coverage" number cannot be used to prove the page yield Bryant should have received from all of her cartridges, over the lifetime of the printer. Based on this evidence alone, a reasonable jury could not find that Bryant suffered "actual damage."

Like DiCuio, the other evidence presented shows that Bryant likely received the advertised page yield. The sample documents submitted by Bryant showed enormous variation in color coverage[16], but, if these documents are representative of her printing habits, they show that she printed, on average, more than 5% color coverage. *See* Def. Ex. 24 ("Print Sample Coverage Analysis"). While Bryant argues that these documents are not representative of her printing habits[17], there is no other evidence to show that her average color coverage for her documents was lower.

---

[16] Specifically, Bryant submitted which had the following average percent color coverage: a syllabus, which showed 0.64% cyan, 0.56% magenta, 0.00 yellow; a Chicago Journal webpage, with 7.60% cyan, 8.02% magenta, and 8.08% yellow; a Chicago Phoenix webpage, with 6.94% cyan, 6.95% magenta, and 8.79% yellow; and a PowerPoint presentation which showed 53.5% cyan, 47.4% magenta, and 33.7% yellow.

[17] I note that at Bryant's deposition, she stated that stated that these documents were "typical to me" but also "random." Bryant Dep. at 19:15–17, 35:13

Bryant thus failed to demonstrate the average coverage of her printed documents, and therefore she cannot show the corresponding page yield she should have received from each cartridge. Without this information, I cannot ascertain that Bryant suffered any loss from the allegedly deceptive acts or practices of Defendant.

Because the record does not show the Bryant was "harmed in a concrete, ascertainable way." *Frye v. L'Oreal USA, Inc.*, 583 F. Supp. 2d at 957, Bryant's Illinois Consumer Fraud and Deceptive Business Practices Act claim must be dismissed. Furthermore, without any admissible evidence showing either reduced page yield or which, if any, of the printer cartridges were purchased to replace non-depleted cartridges, Bryant has not shown that she suffered an injury-in-fact. Bryant therefore also lacks standing to proceed with the claim. To the extent that Defendant acted wrongfully in the design of the toner cartridges, Bryant has failed to show that she suffered any harm from Defendant's actions. Accordingly, Defendant's Motion for Summary Judgment against Bryant is granted.

### D. Causation

Having already found that summary judgment must be granted against Bryant, I need not address the argument on causation. I note, however, Bryant's testimony that "[m]y understanding on the date of purchase was that I would be able to achieve 2500 pages maximum." Bryant Dep. at 52:12–17. Because she did not understand Defendant's representation of page yield at the time of purchase, it is unlikely that Bryant could show that she was deceived by the representation that the yield for color cartridges was 1,500 pages, and that defendant's conduct was a but-for cause of her harm. *See Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 218 (Ill. 2004) (to state a claim under Illinois CFA "proof of actual deception of a plaintiff is required."); *Price v. Phillip Morris, Inc.*, 848 N.E.2d 1, 52 (Ill. 2005) (Illinois CFA requires "but-for" causation, for

which "the relevant inquiry is whether the harm would have occurred absent the defendant's conduct.").

**E. Attorney's Fees**

Defendant argues that it is entitled to attorney's fees under the Illinois CFA. Bryant S.J. Mot. at 38. Acknowledging that a showing of bad faith is required for a defendant to be granted attorney's fees, Defendant argues that "Plaintiff acted in bad faith by suing on false claims and failing to preserve relevant evidence." *Id.* Defendant therefore requests that this Court make a finding of bad faith so Defendant may later present evidence regarding the amount of the fees. *Id.* at 39. Bryant does not respond to this request.

Under the Illinois CFA, a defendant, unlike a plaintiff, may be awarded fees "only if the trial court makes a threshold finding that the plaintiff acted in bad faith." *Krautsack*, 861 N.E.2d at 647. To explain the difference in treatment between plaintiffs and defendants, the Illinois Supreme Court reasoned that "a prevailing plaintiff has already proven that the defendant is guilty of consumer fraud," while "[a] prevailing defendant . . . has not necessarily established anything more than that the plaintiff's efforts at suit were unsuccessful." *Id.* at 646–47. However, "[c]ourts have not specifically defined 'bad faith' in this context." *Goldberg v. 401 N. Wabash Venture LLC*, Civ. No. 09-6455, 2013 WL 5376556 at *2 (N.D. Ill. Sept. 25, 2013). The Illinois Supreme Court has stated that bad faith is not limited to the "pleadings, motions and other papers," finding that such a rule would be "too narrow." *Krautsack*, 861, N.E.2d at 648. In the same case, the Illinois Supreme Court also declined to adopt an "oppressive" standard promulgated by the Seventh Circuit: "Even if a suit is brought in good faith, it could be so lacking in merit or so burdensome to defend against as to be oppressive, in which event the defendant would have a powerful equitable claim to recover a reasonable attorneys' fee." *Id.* at

40

647 (quoting *Door Systems, Inc. v. Pro-Line Door Systems, Inc.*, 126 F.3d 1028, 1030 (7th Cir. 1997)).

Under any standard, though, there is no evidence to support the allegation that Bryant acted in bad faith. While the evidence did not support her claim, all this shows is that "plaintiff's efforts at suit were unsuccessful." *Krautsack*, 861 N.E. at 647. Defendant has further failed to show that Bryant's failure to preserve evidence was done in bad faith, *see infra*. Accordingly, Defendant's request for attorney's fees is denied.

**D. Spoliation**

Because summary judgment must be granted on the Illinois CFA count, I need not address Defendant's argument on spoliation, which largely mirror its assertions against Plaintiff DiCuio. I note again, however, that spoliation requires a showing of bad faith, and the burden to show spoliation is on the party seeking the determination. *Bull v. United Parcel Serv.*, 665 F.3d 68, 74, 77 (3d Cir. 2012). Defendant asserts that Bryant "chose to discard" her used cartridges and receipts, Bryant S.J. Mot. at 20, yet Defendant has not produced any evidence to support this assertion. It is clear that Bryant did not produce the cartridges or receipts[18] in discovery. Bryant SUMF at ¶ 30–31. However, nothing in the record shows whether she routinely recycled[19] her cartridges, whether the cartridges and receipts were simply lost, or even if Bryant had deliberately withheld them. Without any evidence on the question of good faith, a finding of spoliation would be improper.

---

[18] While Bryant could not produce the paper receipts, she did produce records of twelve purchases from her Staples Rewards account. *See* Def. Ex. 60.

[19] Bryant points to an interrogatory response which stated that she did, in fact, recycle her cartridges on one occasion. Bryant Opp. at 28.

**SUMMARY JUDGMENT AGAINST PLAINTIFF POCILUYKO**

As with the other Plaintiffs, Defendant argues that Plaintiff Pociluyko lacks standing to bring her claim. In addition, Defendant asserts that Plaintiff cannot make her claim under multiple elements of the Indiana Deceptive Consumer Sales Act. I shall address each claim in turn.

**A. Factual Background**

Karen Pociluyko ("Karen" or "Pociluyko"), currently a resident of Michigan, is suing over a Brother-brand color laser printer model number HL-4070CDW ("Pociluyko printer"). Pociluyko Summary of Undisputed Material Facts ("Pociluyko SUMF") at ¶¶ 9, 12. The Pociluyko printer was purchased on January 7, 2010, at a Fry's Electronics Store in Indiana. *Id.* at ¶ 13. The Pociluyko printer was purchased with a credit card belonging to Terry Pociluyko ("Terry"), who was, at the time, in a relationship with Karen Pociluyko.[20] *Id.* at ¶¶ 8, 14, 23. Ms. Pociluyko did not formally reimburse Terry. Pociluyko Reply to SUMF at ¶ 15. The Pociluyko printer came with a set of three color toner cartridges; Terry[21] purchased a replacement set of color toner cartridges in May 2011 at a Staples in Michigan. Pociluyko SUMF at ¶¶ 17, 18. Both sets of cartridges were TN-110; the advertised yield for TN-110 cartridges is 1,500 pages at 5% coverage. *Id.* at ¶ 29.

At the time of the purchase, Karen was a resident of Indiana, and Terry was living in a separate state. Pociluyko Dep. at 20:4–13. The printer was originally purchased for "personal use," and Karen was the primary user, although Terry would sometimes use it when visiting

---

[20] Terry and Karen Pociluyko married in December 2010. *Id.* at ¶ 8. Terry Pociluyko was a named plaintiff in the FAC, but withdrew his claims prior to the filing of the SAC. *Id.* at ¶ 9.

[21] It is unclear whether the credit card used to purchase the printer and the replacement cartridges belonged to Terry or to his business. Pociluyko SUMF at ¶¶ 19–22.

Karen. *Id.* at 20:4–23, 21:17–18. In April 2011, Karen moved to Terry's home in Michigan; at that time, she began to use the printer primarily for her husband's business. *Id.* at 25:15 to 26:3, 31:22.

The Pociluyko printer was used with the original toner cartridges until May 2011. Pociluyko SUMF at ¶ 25. In May 2011, the printer indicated that the toner was empty and stopped functioning. Pociluyko Dep. at 84:1–8. Karen could not recall whether the message specified that a particular color cartridge had run out, but she purchased a full set of new color cartridges. *Id.* at 84:12–19. Karen installed the second color cartridge set, but could not recall if she attempted to replace only one color first. *Id.* at 85:10–23. Pociluyko SUMF at ¶ 25. In November or December of 2011, the printer again indicated that it was out of toner. Pociluyko Dep. at 92:6–9. At that point, Karen placed black electrical tape over the optical sensor windows of the second color cartridge set and continued to use them. *Id.* at 92:17–18. Eventually, the printer again displayed a "toner end of life" message, at which point Karen placed tape over the optical sensor window of the original toner cartridges and reinstalled them. *Id.* at 87:20 to 88:9. The Pociluyko printer only ever used these two sets of color cartridges. Pociluyko SUMF at ¶ 28. Defendant's experts acknowledged that the second set of cartridges must have hit the developer roller failsafe, because she disabled the optical sensor mechanism by taping over the windows. Cooper Decl. at ¶ 45.

A maintenance report from the Pociluyko printer indicated that it had printed a total of 6,140 color pages. Pociluyko SUMF at ¶ 33. The maintenance report also indicated that the "average color coverage" for each color was 0.04%. Def. Ex. 20 (Pociluyko Maintenance Report). Karen indicated that since moving to Michigan, she printed manuals for her husband's business approximately once a month. Pociluyko Dep. at 51:12–21. When given a page from one

such manual, Karen stated that the color coverage was "obviously more than 5% I would think, but I don't know 'cause I don't have any measurements." *Id.* at 115:3–5. Defendant's expert calculated the color coverage as 5.56% cyan, 4.62% magenta, and 3.88% yellow.

In addition, Defendant's experts weighed both sets of Karen's toner cartridges, finding that the second set weighed less than the original set. Spencer Decl. at ¶ 17.

**B. Standing**

Defendant argues that Karen Pociluyko lacks standing under Article II because she was not the purchaser of the printer. Pociluyko S.J. Mot. at 4. According to Defendant, Terry, rather than Karen, purchased the Pociluyko printer and the second cartridge set. *Id.* at 11. Thus, according to Defendant, Karen did not suffer any injury in fact caused by the unnecessary purchase of new toner. *Id.*[22]

Karen, in response, asserts that the Pociluyko printer was purchased primarily for Karen's personal use, and that it was used primarily for her personal use until she moved to Michigan in April 2011. Pociluyko Opp. at 6. In addition, Karen alleges that the decision to purchase the printer was made jointly between Karen and Terry. *Id.* She argues that she and Terry used Terry's card for some purchases, and Karen's card for others, each thereby offsetting the items the other person paid for. *Id.* at 7. Moreover, Karen notes that the Indiana statute does not require a direct transaction between the plaintiff and defendant. *Id.* at 7. She further points out that

---

[22] Defendant additionally asserts that Karen cannot show that she purchased "unnecessary" toner, because her cartridges exceeded their advertised yield. *Id.* at 5. Because this argument, which largely mirrors the arguments against DiCuio and Bryant, is so intertwined with the substantive state law question, I shall address it in the section on the Indiana Deceptive Consumer Sales Act *infra*.

"other courts have found that recipients of gifts and of spousal purchases have standing to bring claims under state consumer fraud statutes." *Id.*

I have already discussed the general requirements to show standing, *supra*. I further note that even where state laws permit a private party to pursue a cause of action without an individualized injury, Article III of the Constitution "limits the jurisdiction of the federal courts to "cases and controversies," a restriction that has been held to require a plaintiff to show, *inter alia*, that he has actually been injured by the defendant's challenged conduct." *Lee v. American Nat'l Ins. Co.*, 260 F.3d 997, 1001 (9th Cir. 2001). Thus, "a plaintiff whose cause of action is perfectly viable in state court under state law may nonetheless be foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the requisite injury." *Id.* at 1001–02. Accordingly, whether Karen has standing to bring suit under Indiana law is irrelevant to the question of Article III standing. The cases cited by Karen to show that a gift recipient may have standing under state consumer fraud statutes are only examining whether a non-purchaser may nonetheless be considered a "consumer" for the purpose of that statute. *See* Pociluyko Opp. at 7 n. 6.[23] In federal court, however, the plaintiff must show some evidence that she herself suffered an injury in fact.

However, the cases cited by Defendant to show that Karen lacks standing are similarly unhelpful. These cases examined whether, in the context of class action lawsuits, plaintiffs have standing "to recover for injuries associated with products they neither purchased nor used." *Burke v. Weight Watchers Internat'l, Inc.* 983 F. Supp. 2d 478, 482 (D.N.J. 2013); *see also Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 537 (D.N.J. 2011). Here,

---

[23] Curiously, all the cases cited by Pociluyko are Texas state court cases, although the Texas statute is not at issue in this case.

in contrast, Karen is suing only for alleged injuries associated with a printer which she did, in fact, use. The evidence shows that the printer was purchased primarily for Karen's use; that for over a year, Karen chiefly used the printer for her personal use; and that she continued to have use of it for her own personal matters after moving in with Terry, although such matters ceased to be the primary use. If, therefore, an injury was suffered from the alleged issues with the printer, such injury was suffered, at least in part, by Karen Pociluyko.

As with the other Plaintiffs, whether any injury-in-fact occurred is a question that is intertwined with questions of state law. I shall therefore determine which law applies, and conduct my analysis on that basis.

## C. Choice of Law

Defendant asserts that there are substantive conflicts between the NJCFA and the Indiana Deceptive Consumer Sales Act ("IDCSA"). These include: that Indiana limits claims to "consumer" transactions, while the NJCFA permits claims for business transactions; omissions are not actionable under the IDCSA, but are under the NJCFA; the IDCSA requires pre-litigation notice for certain claims, and the NJCFA does not; the IDCSA requires reliance in private claims, while the NJCFA does not; and the two statutes have different measures of damages. Pociluyko S.J. Mot. at 15. Pociluyko does not dispute these differences, but merely states that if a choice of law analysis must be performed at this stage, "New Jersey law governs." Pociluyko Opp. at 15.

The differences described by Defendant are substantive. In particular, the fact that the IDCSA limits "consumer transactions" to ones for "purposes that are primarily personal, familial, charitable, agricultural, or household," *see* Ind. Code § 25-5-0.5-2(a)(1), while the NJCFA encompasses business transactions, *see* N.J. Stat. Ann. § 56:8-1, represents a conflict

here, as Defendant asserts that Terry purchased the printer as a business transaction. Similarly, the IDCSA requires that a plaintiff provide written notice to a supplier, except in the case of "incurable" deceptive acts. Ind. Code § 25-5-0.5-5(a). Defendant asserts that Pociluyko failed to meet this requirement. New Jersey has no such requirement. The fact that these differences are potentially outcome-determinative makes the conflict between the laws clear.

As with Bryant, *supra*, the factors to determine which state has the most significant interest favor the state where Pociluyko purchased the printer, Indiana. Pociluyko therefore may not make a claim under the NJCFA, and I will apply the IDCSA going forward.

### D. Indiana Deceptive Consumer Sales Act

Defendant makes several arguments that Pociluyko does not have a claim under the IDCSA. I will first address Defendant's argument that Pociluyko failed to give the notice required by the IDCSA. Because "the failure on the part of a consumer to give proper notice to the supplier of an uncured deceptive act precludes the application of the statute altogether," *Lehman v. Stroyer*, 721 N.E.2d 365, 369 (Ind. Ct. App. 1999), I shall address that question first.

I first note that prior to July 2014, the IDCSA imposed liability only for discrete categories of "deceptive acts"; there was no "general fraud" provision, and the statute did not include deceptive omissions. *See Lawson v. Hale*, 902 N.E.2d 267, 274 (Ind. App. 2009). The statute was amended in 2014 to include such a "catch all" provision, and to provide liability for omissions. *See* 2014 Ind. Legis. Serv. P.L. 65-2014 (West). However, this suit was amended to include a claim under the IDCSA in 2011. In Indiana, "[u]nless there are strong and compelling reasons, statutes will normally be given prospective application." *Metro Holding Co. v. Mitchell*, 589 N.E.2d 217, 219 (quoting *Gosnell v. Indiana Soft Water Servs.*, 503 N.E.2d 879, 880 (1979)). There are no strong and compelling reasons to think that the amendments to the IDCSA

47

were intended to apply retroactively; indeed, both parties rely exclusively on the older version of the law. Accordingly, I find that the prior version of the statute applies to this claim, and shall be referenced herein as if it were still in effect.

The IDCSA requires plaintiffs to "given notice in writing to the supplier" which must "state fully the nature of the alleged deceptive act and the actual damage suffered therefrom." Ind. Code. § 24-5-0.5-5(a). The purpose of the notice provision "act is to provide and facilitate pre-complaint settlements of consumer actions wherever possible and to establish a limited period during which such settlement may be accomplished." *McCormick Piano & Organ Co. v. Geiger*, 412 N.E.2d 842, 849 (Ind. Ct. App. 1980). In order to effectuate this purpose, "a literal application of the notice provisions" is required. *Id.* Indeed, the question of notice "is an essential element of plaintiff's statutory action." *Lehman*, 721 N.E. at 369.

However, the statute does not require pre-suit notice where "the deceptive act is incurable." Ind. Code. § 24-5-0.5-5(a). An "incurable deceptive act" is "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code. § 25-5-0.5-2(a)(8). "Intent to defraud or mislead is thus clearly an element of an incurable deceptive act." *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 647 (Ind. Ct. App. 2004). The Indiana Supreme Court has found that the distinction between the two terms is significant: "Where a consumer has given the prescribed notice his statutory cause of action is predicated on an "uncured deceptive act" and he need only prove commission of an act or practice which has been defined as deceptive by [Ind. Code § 24-5-0.5-3(a)] in order to establish a prima facie case." *McCormick*, 412 N.E. at 849. In contrast, if a plaintiff fails to give notice "the consumer must prove not only that a deceptive act was committed but also that it was done as part of a

48

scheme, artifice or device with the intent to defraud or mislead." *Id.* The failure to provide notice means that "an additional element of proof is imposed on [the plaintiff]." *Id.*

It is not disputed that no notice was provided to Defendant. Pociluyko S.J. Mot. at 28; Pociluyko Opp. at 19. Pociluyko asserts that notice was not required—that the deceptive act was "incurable"—because Defendant "knowingly misrepresented page yield of the printer" and "knowingly failed to disclose known material facts" about the "phantom" developer roller counts. *Id.* Pociluyko contends that "the intentional nature of Defendant's misrepresentation are . . . evident from the facts above, and from Defendant's decision to now publish additional . . . information to some consumers." *Id.* Defendant, however, argues that the Second Amended Complaint only alleges intent to defraud in connection with the "concealment, suppression or omission of material facts." Pociluyko S.J. Mot. at 28. Such omissions, Defendant asserts are not actionable under the IDCSA, and therefore cannot be "incurable" deceptive acts. *Id.*

Indeed, Pociluyko's claim that Defendant "fail[ed] to disclose known material facts" does not constitute a deceptive act under the IDSCA. *See Lawson*, 902 N.E.2d at 274 (stating that the IDCSA "does not apply to non-disclosures"). Furthermore, the IDCSA claim in the SAC only refers to intent with respect to "concealment, suppression or omission of material facts." SAC at ¶ 61 ("The promotion and release of the defective Printers and/or Cartridges into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentation, and/or concealment, suppression or omission of material facts with <u>the intent that others would rely upon such concealment, suppression or omission</u>." (emphasis added)). Again, such omissions are not actionable. While Pociluyko now claims that misrepresentations of page yield were also intentional, "[a] plaintiff may not amend his complaint through

49

arguments in his brief in opposition to a motion for summary judgment." *Bell v. City of Philadelphia*, 275 Fed. App'x 157, 160 (3d Cir. 2008).

Furthermore, even if the SAC could be read to allege an intent to misrepresent the page yield, Pociluyko has not provided any evidence to show that such a misrepresentation was made with the intent to defraud or mislead. "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive."[24] *Heckler & Koch, Inc. v. German Sport Guns GmbH*, No. 1:11-cv-01108, 2014 WL 7366578, at *8 (S.D. Ind. Dec. 24, 2014). Pociluyko asserts that the "intentional nature of Defendant's misrepresentations are evident" from the failure to disclose the developer roller mechanism and the "phantom" rotations. Pociluko Opp. at 19. This is insufficient to show intent. Plaintiff has not pointed to any piece of evidence showing that the alleged misrepresentation was made "knowingly" or "recklessly." Indeed, the only evidence provided to the Court which relates to the question of a knowing or reckless misrepresentation is the deposition of Charles Stadler, Brother's Vice-President of National Service. Stadler stated that the developer roller count mechanism was not disclosed to customers because "that's a technical issue, it has no meaning to the customer." Stadler Dep. at 85:15–16. However, this statement does not show any reckless or knowing misrepresentation as to page yield. In the absence of any evidence to suggest that Defendant's alleged misrepresentation as to page yield was made with the intent to defraud or misrepresent, Pociluyko cannot show that the

---

[24] This definition was used in a case involving common law fraud. Indiana case law defining the meaning of intent in the IDCSA is sparse; further, while common law fraud is not co-extensive with consumer fraud, this definition adequately clarifies the meaning of "intent" in Indiana law in a similar context.

allegedly deceptive act was "incurable." Thus, notice was required under the IDCSA, and in the absence of such notice, no claim can be brought. *See Lehman*, 721 N.E. 2d at 369.

Having found that summary judgment is required for lack of notice, I need not address the remaining arguments raised by Defendant: that the IDSCA does not apply to purchases in Michigan and therefore does not apply to the purchase of the second toner cartridge set; that there was no "consumer transaction" in Indiana because the purchase of the printer was a business transaction; and that Pociluyko has not suffered actual damages. I will, however, briefly comment on the question of actual damages. Pociluyko's claim that she suffered actual damages is based on the same "average coverage" data relied on by DiCuio and Bryant. Accordingly, her argument suffers from the same flaws—namely, that the "average coverage" data resets when a new cartridge is inserted, and does not show the "average coverage" of all the used cartridges over the lifetime of the printer. This number therefore does not show what page yield Pociluyko should have received for all her cartridges. Thus, were I to examine the merits, I would find that Pociluyko failed to show actual damages, and, further, lacks standing to bring a claim.

**SUMMARY JUDGMENT AGAINST PLAINTIFF SELF**

**A. Facts**

Plaintiff William Self, a Florida resident, purchased two Brother-brand printers. Self Statement of Undisputed Material Facts ("Self SUMF") at ¶ 9. In January 2009, Self purchased a Brother 4040CN ("4040CN") color laser printer for $239.99; the printer came with standard TN-110 toner cartridges. *Id.* at ¶ 10–11. Self only used the 4040CN for a short period of time in January 2009 before deciding that he wanted a printer that could do double-sided printing. *Id.* at ¶ 15. In February 2009, Self purchased a Brother 4070CDW ("4070CDW") color laser printer

for $349.99; this printer also came with standard TN-110 toner cartridges. *Id.* at ¶¶ 12–13. Self kept the 4040CN for potential use as spare parts. *Id.* at ¶ 16. Self bought only one set of replacement cartridges, TN-115 color toner cartridges, in July 2009. *Id.* at ¶ 14.

The first set of toner cartridges that Self used in the 4070CDW were the partially used TN-110 set from the 4040CN. *Id.* at ¶ 19. A few months later, the 4070CDW displayed a message indicating "toner life end"; Self could not recall the date, but Defendant's customer service records indicated that he called on July 30, 2009 with a complaint about replacing the cartridges. *Id.* at ¶ 20. Upon replacing one cartridge, he immediately got a message indicating that another color had to be replaced; when he replaced the second cartridge, he received a message saying the third one had to be replaced. Self Dep. at 10:6–13. Self then called Brother "tech support," which ultimately told Self to replace all three cartridges. *Id.* at 10:17 to 11:3.[25]

At a later date, the printer again showed a message indicating "toner life end"; Self could not recall the exact date, but the Brother customer service records show he called about a toner life end message on April 6, 2010. Self SUMF at ¶ 22. Self testified that "it was just like the first time" and that upon changing one toner cartridge, the next one indicated it was at life end, until he had changed all three cartridges. Self Dep. at 85:25 to 86:13. At that time, Self installed the TN-115 cartridges. Self SUMF at ¶ 23. On or about July 27, 2012, Self received another toner life end message, and stopped using the 4070CDW and the TN-115 cartridges. *Id.* at ¶ 24.

Self printed approximately 60 pages per week. *Id.* at ¶ 25. He testified that "everything I printed was usually color because I didn't know how to turn color off." Self Dep. at 88:2–4. When asked whether he "ha[d] any sense when you printed color pages what the percentage

---

[25] Brother's customer service records seem to indicate that Self only changed the cyan and yellow cartridges on July 30, 2009, Def. Ex. 28 (Self Call Record); however, Defendant does not argue this point.

coverage was," Self responded "say 5 percent." *Id.* at 97:13–16. Self further testified that while the high yield cartridges were advertised as providing 4000 pages at 5% coverage, he only "reasonably expect[ed]" to get about 2000. *Id.* at 96:24–25, 97:11–12.

Self became a plaintiff in this suit on December 21, 2011. Self SUMF at ¶ 30. He continued to use the 4070CDW and the TN-115 cartridges after suing Brother. *Id.* at ¶ 33. However, on or around July 27, 2012 Self traded in the 4070CDW at Staples in exchange for a $50 credit towards the purchase of a new printer. *Id.* at ¶ 31. He also recycled all of the toner cartridges. *Id.* at ¶ 32. Self printed a maintenance report when he replaced the first set of cartridges in the 4070CDW; he did not save the report, but believes the page count number was between 1200 and 1250 pages. Self Dep. at 95:7–12. Self additionally may have printed a maintenance report for the printer on or around when he replaced the second set of toner cartridges, but did not keep the report. *Id.* at 102:16–23. Self testified that he believed the second set of TN-110 toner cartridges, also used in the 40070CDW, yielded 1200–1300 pages. *Id.* at 99:2.

Self provided only the 4040CN, his other printer, in discovery. *Id.* at 14:13. The maintenance report from that printer showed that he printed 5 pages total, 2 of which were in color. Self 4040CN Maintenance Report (Graifman Decl. Ex. M). The report showed that the "average coverage" for the two color pages printed with the 4040CN was 3.34% for cyan, 2.94% for magenta, and 2.99% for yellow. Self also presented three sample documents; Defendant's expert, Spencer, analyzed these documents for their color composition. Print Sample Coverage Analysis (Def. Ex 24). The coverage on these documents had the following ranges: cyan, 2% to 5%, magenta, 1% to 5%, yellow, .5% to 4%. *Id.*

Based on Self's testimony that he printed, on average, 60 pages a week, that "everything" was printed in color, and on the dates Self called Brother about his toner "life end" signals, Defendant estimated the following page yields for Self's color toner cartridges: for the set of cartridges which shipped with the 4040CN, 1,500 pages; the set of cartridges which shipped with the 4070CDW, 2,100 pages; the TN-115 (high-yield) cartridges, 7,200 pages. Self S.J. Mot. at 4.

### B. Choice of Law

Defendant asserts that there are substantive conflicts between the NJCFA and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Self S.J. Mot. at 24. Defendant points to the NJCFA's treble damages provision, and the fact that only plaintiffs may recover attorney's fees. *Id.* In addition, Defendant states that the NJCFA permits recovery for any "ascertainable loss" where there is a "causal nexus" to a prohibited act, while the FDUTPA does not permit consequential damages. *Id.*

Self asserts that the statutory differences are illusory here. Self Opp. at 17.  Self argues, that he is only seeking actual damages, not consequential damages. *Id.* Furthermore, Self asserts no conflict with regard to the trebling of damages or attorney's fees because Florida courts award a fee multiplier to prevailing plaintiffs. *Id.* This multiplier, though unexplained by Self, presumably negates the treble damages distinction. In addition, Self argues that Florida courts award fees to prevailing defendants only where the claims are frivolous. *Id.* Self, like Bryant, also asserts that New Jersey law should apply because Defendant requires consumers who use its websites to submit to New Jersey law. *Id.* at 18.

The NJCFA entitles prevailing plaintiffs to treble damages, N.J. Stat. Ann. § 65:8-19, while the FDUTPA merely provides for recovery of "actual damages." *See* Fla. Stat. § 501.211. It is not clear why the award of a fee multiplier to prevailing plaintiffs would negate this

distinction. In particular, the treble damages affects the plaintiff's recovery, while an attorney fee multiplier is awarded for a plaintiff's counsel and merely increases the defendant's loss. This conflict, on its own, would be sufficient to require a choice-of-law analysis. In addition, however, the NJCFA mandates recovery of attorney's fees only for prevailing plaintiffs, N.J. Stat. Ann. § 65:8-19, while the FDUTPA permits either party to recover attorney's fees, Fla. Stat. § 501.2105. Self is incorrect in asserting that fees are only awarded to prevailing defendants if the claims are frivolous. *See Human Soc'y of Broward Cnty, Inc. v. Fla. Humane Soc'y*, 951 So. 2d 966, 970–71 (Fla. Dist. Ct. App. 2007) (rejecting argument that FDUTPA entitles prevailing fees to defendants "only if the plaintiff's statutory claim is frivolous or groundless"); *see also Colomar v. Mercy Hosp., Inc.*, 335 Fed. App'x 29, 31 (11th Cir. 2009) (applying multiple factors from *Humane Soc'y* to determine whether defendant is entitled to attorney's fees). I therefore find that the two statutes are in conflict.

As discussed in the Bryant Summary Judgment section, *supra*, the six Restatement factors support applying the law of Self's home state, Florida. Accordingly, I will examine Self's claim under the FDUTPA.

**C. Standing and Actual Damages Under the Florida Deceptive and Unfair Trade Practices Act**

A claim under the FDUTPA has three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kenneth F. Hackett & Assoc., Inc. v. GE Capital Info. Tech. Solutions, Inc.*, 744 F. Supp.2 d 1305, 1312 (S.D. Fla. 2010). Under Florida case law, the measure of "actual damages" is "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rodriguez v. Recovery*

55

*Performance & Marine, LLC*, 38 So. 3d 178, 180 (Fla. Dist. Ct. App. 2010) (quoting *Rollins,*

*Inc. v. Heller*, 454 So.2d 580, 585 (Fla. 3d DCA 1984)). That is, Florida uses a "benefit of the

bargain" measure. *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 826 (Fla. Dist. Ct. App.

2010).

Defendant asserts, as it does with the other Plaintiffs, that Self lacks standing and cannot

show actual damages under the FDUTPA. First, Defendant argues that the color toner cartridges

"performed as advertised. Self S.J. Mot. at 7. Moreover, according to Defendant, Self "claims

damages measured by the entire retail value of every Brother-brand product he purchased." *Id.* at

31. Self, Defendant asserts, "made no attempt during discovery to quantify any diminution in

value caused by his purportedly receiving less than the advertised page yield." *Id.* at 31. Nor,

Defendant argues, has Self "limited his damages to the cost of cartridge purchased to replace

those that had not performed as advertised," because Self has no evidence of such damages. *Id.*

Like the other Plaintiffs, Self argues that, based on Plaintiffs' expert opinions, the printers

are designed so that the developer roller unnecessarily rotates, and hence reaches the failsafe

limit. Self Opp. at 3–5. However, as with the other Plaintiffs, the expert's generalized opinions

are insufficient to show that Self suffered actual damages from this mechanism.

In addition, Self asserts that "he did not receive the number of pages promised for his

TN-110 cartridge[s]."[26] *Id.* at 22–23. Like the other Plaintiffs, Self asserts that the page yield

number is linear—that is, if the cartridges yield 1,500 pages at 5% coverage, they should yield

3,000 pages at 2.5% coverage. *Id.* at 7. Based on this formula, Self provides two calculations of

loss. The first calculation uses the "average coverage" data obtained from the 4040CN

---

[26] Self does not, apparently, claim any losses from the TN-115 cartridges.

maintenance report, which showed the following "average coverage" percentages: 3.34% for cyan, 2.94% for magenta, and 2.99% for yellow. *Id.* Based on these percentages, Self asserts that he should have received the following number of pages for each cartridge: 2,245 for cyan, 2,551 for magenta, and 2,508 for yellow. *Id.* Using Defendant's estimate for the number of pages Self printed—1,500 pages for the set of cartridges that shipped with the 4040CN printer, and 2,100 pages for the set of cartridges that shipped with the 4070CDW printer—Self asserts that he did not receive the page yield promised. *Id.* at 8, Table 2.

I must emphasize that Self did not produce the 4070CDW printer—the only printer he used regularly—in discovery. Accordingly, there is no hard data to support Self's claims that he suffered a loss; all the numbers and calculations provided by the parties are estimates. Even accepting these numbers as true, however, Self has failed to show that he suffered actual damage.

As has already been stated, the "average coverage" data from the maintenance reports does not support Plaintiffs' page yield argument, because the "average coverage" number resets to zero when a new cartridge is inserted. More importantly, the "average coverage" number provided to support Self's argument is taken from his 4040CN printer, which only printed two pages in color. This data cannot show the average coverage Self received while using his 4070CDW printer. Because Self only used his toner cartridges with the 4070CDW printer (save 5 pages printed with the 4040CN), the 4040CN "average coverage" number cannot be used to calculate the page yield he received from the cartridges.

Self also provides a second calculation based on the percent coverage analysis done on Self's sample documents. Assuming that the samples provided by Self in discovery are

representative[27], Self asserts that his average color coverage was 2.87% for cyan, 2.5% for magenta, and 1.5% for yellow. *Id.* Again, using a linear formula, Self alleges that using these numbers, he should have received 2613 pages for the cyan cartridges, 3000 pages for the magenta cartridges, and 5208 pages for the yellow cartridges. *Id.*

      This second calculation, though, is also invalid. In order for this calculation to accurately show that Self received an average color coverage of less than 5% for each color, these documents must be representative of the printing Self performed.[28] However, Self testified that the sample documents were not "the typical sorts of pages" that he printed every week, but were merely "random things I grabbed off so I could show you guys." Self Dep. at 126:25 to 127:4. In the absence of any testimony to show that these documents are mathematically proportional to the documents Self ordinarily printed, they do not demonstrate the average coverage he received from using the 4070CDW printer or either set of the TN-110 cartridges.[29]

---

[27] The way Self reached these numbers is as follows: Self provided three sample documents which are identified in Def. Ex. 24 as a five page "Toyota email," a single page "Turbo Tax" email, and a two page "SW airlines" webpage. The Toyota email has 2% coverage of cyan; the Turbo Tax email has 3% coverage of cyan, and the SW airlines webpage has 5% coverage of cyan. Def. Ex. 24, Print Sample Analysis. Self assumed that out of every eight pages he printed, five pages would have 2% coverage, one page would have 3% coverage, and two pages would have 5% coverage. Averaging these numbers, Self calculated that the "average coverage" per page printed for cyan is 2.87%.

[28] Notably, Self is the only Plaintiff to rely on the average color coverage of his sample documents in order to show what page yield he should have received; each of the other Plaintiffs asserted that the average color coverage of their sample documents should not be used in this manner because the samples were not representative of their printing habits.

[29] Defendant also argues that Self "was not damaged in any way by the purchase of the 4040CN." Self S.J. Mot. at 7. While Self, in response, claims that "his 4040CN printer with original cartridges was incapable of providing him the full represented color yield for any color cartridge," Self Opp. at 12, it appears from Self's arguments that the only damages Self alleges for the purchase of the 4040CN printer relate to the page yield of the cartridges—that is, Self does not assert that the printer itself had a diminished value separate and apart from the diminished value of the cartridges.

Thus, Self failed to demonstrate the average coverage of his printed document, and therefore cannot show "the difference in the market value of the product . . . in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Rodriguez*, 38 So. 3d at 180. In the absence of such information, an element of the FDUTPA claim is lacking, and summary judgment must be granted in Defendant's favor. In addition, without evidence of actual damages, Self cannot show that he suffered an injury-in-fact. Self therefore lacks standing to bring a claim.

### D. Spoliation

Although I have already found in Defendant's favor, I shall briefly address the spoliation issue. Defendant argues that Self engaged in spoliation by discarding the 4070CDW printer, and used color cartridges. Self S.J. Mot. at 15. However, bad faith is a necessary component of spoliation, and the burden is on Defendant to provide evidence of this element. *See Bull v. United Parcel Serv.*, 665 F.3d at 77, 79. Self testified that "I didn't know that you guys would need the printers," and that no one told him that he was not supposed to discard relevant evidence in this case. Self Dep. at 15:8–16. While this testimony strongly suggests that Self's counsel failed to thoroughly explain his duty to preserve relevant evidence[30], it does not show bad faith. Moreover, even if Self's action constituted spoliation, negligent spoliation is insufficient to merit dismissal. *See Klett v. Green*, 2012 WL 2476368 at *11 ("because the Court has found that Plaintiff, at best, negligently spoiled the evidence, . . . dismissal is not appropriate."). I therefore conclude that Self's claim cannot be dismissed for spoliation.

---

[30] Self's opposition brief states that "Plaintiff's counsel advised all Plaintiffs to preserve evidence related to the action." Self Opp. at 23.

Because Self is unable to show "actual damages" as required by the FDUTPA, and is likewise unable to show an injury-in-fact as required for Article III standing, summary judgment is granted for Defendant.


**CONCLUSION**

For the reasons stated above, Defendant's motions for summary judgment against Plaintiffs DiCuio, Bryant, Pociluyko, and Self are granted, and each of Plaintiffs' claims are therefore dismissed. Having dismissed the claims of the named Plaintiffs, these plaintiffs cannot stand as class representatives. Hence, the motion for class certification is moot, as are the motions to strike portions of Plaintiffs' evidence.

An appropriate order shall follow.


Date:   May 27, 2015

                                             _/s/ Freda L. Wolfson_____
                                               Hon. Freda L. Wolfson, U.S.D.J.